USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/22/2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
IN RE                                       :       MDL No. 1409
                                            :       M 21-95
CURRENCY CONVERSION FEE                      :
ANTITRUST LITIGATION                        :       MEMORANDUM & ORDER

- - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
THIS DOCUMENT RELATES TO:                   :

ALL CASES                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - -x

WILLIAM H. PAULEY III, District Judge:

        The class actions in this multi-district litigation assert violations of the Sherman

Act, 15 U.S.C. § 1 et seq., the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., the

Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq., and the South Dakota Deceptive Trade

Practices Act ("DTPA"), arising from an alleged price-fixing conspiracy among VISA,

MasterCard, and their member banks (the "Bank Defendants") related to foreign currency

conversion fees. Plaintiffs move for final approval of a proposed settlement with Defendants

pursuant to Fed. R. Civ. P. 23(e). Class Counsel move for attorney's fees, and incentive awards

for the class representatives. Various members of the class object. For the reasons set forth

below, Plaintiffs' motion is granted, Class Counsel's motions are granted in part and denied in

part, and the objections are overruled.

        The complex factual and procedural background underlying these actions is set

forth in this Court's prior opinions, familiarity with which is presumed. See In re Currency

Conversion Fee Antitrust Litig., No. M 21-95, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006); In re

Currency Conversion Fee Antitrust Litig., No. M 21-95, 2005 WL 3304605 (S.D.N.Y. Dec. 7,

2005); In re Currency Conversion Fee Antitrust Litig., No. M 21-95, 2005 WL 1871012

(S.D.N.Y. Aug. 9, 2005); In re Currency Conversion Fee Antitrust Litig., 229 F.R.D. 57

(S.D.N.Y. 2005); In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237 (S.D.N.Y.

2005); In re Currency Conversion Fee Antitrust Litig., 224 F.R.D. 555 (S.D.N.Y. 2004); In re

Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385 (S.D.N.Y. 2003).


## BACKGROUND

I. The Underlying Allegations

      This litigation challenges the currency conversion practices of the consumer

payment card industry.  To provide context for the Settlement, the Third Consolidated Amended

Class Action Complaint (the "Complaint" or "Compl.") is summarized below.

A. VISA and MasterCard Associations

      Defendants VISA and MasterCard are the two largest general purpose card

networks in the world and dominate the market for debit cards.[1]  (Compl. ¶ 90.)  VISA and

MasterCard were joint ventures or, as they called themselves, "membership associations" that

were created, owned, governed, and operated by their member banks.  (Compl. ¶ 94.)  VISA and

MasterCard's networks execute transactions that use one of their affiliated general purpose cards

---

[1] "General purpose cards" enable consumers to purchase goods or services from a merchant without directly accessing or reserving funds at the time of the purchase.  (Third Consolidated Amended Class Action Complaint dated July 18, 2006 ("Compl.") ¶¶ 10, 83.)  There are two primary types of general purpose cards: "credit cards" and "charge cards."  Holders of credit cards receive a line of credit from the credit card issuer (generally a bank), and are permitted to charge purchases to their credit cards.  Then, they may elect to pay the entire amount due within a fixed period of time, or alternatively pay a portion of the amount and finance the remainder over time.  (Compl. ¶¶ 11, 84.)  In contrast, holders of charge cards are required to pay the entire amount due within a set number of days after receiving a monthly billing statement.  (Compl. ¶¶ 11-12, 84.)  Finally, "debit cards" or "ATM cards" are distinct from "general purpose cards" and enable cardholders to access deposits or other assets to pay for goods or services or to withdraw cash.  (Compl. ¶¶ 13, 85.)  General purpose cards and debit cards are referred to collectively as "Payment Cards."  (Compl. ¶ 21, 83.)

or debit cards. (Compl. ¶ 81.) In turn, member banks are authorized to issue VISA and MasterCard branded general purpose cards, and some banks issue Visa and MasterCard branded debit cards. (Compl. ¶ 81.)

B. The Currency Conversion Fees

VISA and MasterCard each use a network that permits United States cardholders to make payments in dollars for purchases in foreign countries denominated in foreign currencies. (Compl. ¶ 103.) Thus, VISA and MasterCard's electronic networks and settlement systems serve as clearinghouses for payment card transactions which occur in foreign countries using payment cards issued by their member banks. (Compl. ¶ 103.) These settlement systems automatically impose foreign currency surcharges, including both VISA/MasterCard surcharges and surcharges implemented by issuing Bank Defendants. (Compl. ¶ 103.) As part of the conversion, cardholders are charged a currency conversion fee ranging from at least 1% to at most 3% of the cost of the purchase. (Compl. ¶¶ 107-125.) VISA and MasterCard utilize a "netting out" procedure to process foreign currency conversions such that the bulk of transactions do not involve the actual purchase or sale of any currency. (Compl. ¶ 104.) Plaintiffs allege that the conversion fee is charged whether or not currency is actually converted or exchanged. (Compl. ¶ 104.)

There are two categories of currency conversion fees. The first, which Plaintiffs label the "first tier" fee, is 1% of the purchase price, which retained by VISA and MasterCard. (Compl. ¶ 108.) The "second tier" fee is "typically" 2%, and often imposed on top of the 1% "first tier" fee. (Compl.¶¶ 107, 122-125.) This 2% second tier fee is automatically charged by the network, and retained by the cardholder's issuing bank. (Compl. ¶¶ 122-125.) Plaintiffs also assert that, absent collusion in the market, imposition of second-tier fees would be against the economic self-interest of each Issuing Bank. (Compl. ¶ 124.)

Diners Club is another general purpose card electronic network and settlement system that processes Diners Club card transactions. (Compl. ¶ 126.) Unlike VISA and MasterCard, it is not a joint venture or member association. The Diners Club network is owned and operated by defendant Citicorp Diners Club, Inc. ("Diners Club"), which issues the Diners Club charge card. (Compl. ¶¶ 126-129.)

Like VISA and MasterCard, Diners Club imposes a currency conversion fee on its cardholders' foreign currency transactions. According to Plaintiffs, Diners Club formerly charged a 1% fee on foreign currency transactions, but then increased that fee to 2% "in line with the recent proliferation" of second tier fees. (Compl. ¶ 127.) Further, Plaintiffs allege that Diners Club is an active and integral part of the conspiracy to impose currency conversion fees. (Compl. ¶ 128.)

B.    Non-Disclosure of the Currency Conversion Fees

In substance, Plaintiffs allege that VISA and MasterCard, together with their member banks, and Diners Club failed to disclose adequately the existence and amount of their currency conversion fees to their cardholders on the monthly billing statements or the solicitations and applications for the payment cards. (Compl. ¶¶ 130-134.)

Plaintiffs contend that the only place currency conversion fees were even partially disclosed was in the cardmember agreement or the initial disclosure statement, which were sent to cardholders when they received their cards. (Compl. ¶ 134.) The Complaint alleges that these "partial disclosures" obscured the fees and violated the disclosure requirements of the Truth in Lending Act ("TILA"). (Compl. ¶ 134.)

Based on these allegations, Plaintiffs advance six claims: (1) antitrust violations under Section One of the Sherman Act against all defendants; (2) antitrust violations under Section One of the Sherman Act against VISA and the Issuing Bank defendants; (3) antitrust

4

violations under Section One of the Sherman Act against MasterCard and the Issuing Bank defendants; (4) violations of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., against all defendants; (5) violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq. against all defendants; and (6) violations of South Dakota Consumer Protection Statutes against defendant Citibank (South Dakota).

       C.    <u>Defendants' Defenses</u>

       Defendants deny Plaintiffs' material allegations. They contend that even assuming the existence of an agreement, the alleged intra-Network conspiracies (between VISA and its members and between MasterCard and its members) were lawful joint ventures. Defendants also assert that Plaintiffs' circumstantial evidence of a conspiracy is insufficient because Defendants had independent economic incentives to impose the fees they did in the way that they did. Finally, Defendants successfully limited the size of the class by compelling arbitration of a number of their cardholders' claims.

## II. Procedural History

       This litigation commenced in February 2001 with the filing of the first of numerous class action complaints challenging credit card currency conversion fees. On August 23, 2001, the Judicial Panel on Multidistrict Litigation transferred the actions to this Court.

       Amendments to the Consolidated Class Action Complaint spawned related actions involving separate theories of liability. On April 23, 2004, <u>Schrank v. Citibank (South Dakota), N.A.</u>, No. 03 Civ. 2843 (WHP) ("<u>Schrank</u>"), was transferred to this Court for coordinated pretrial proceedings. The Plaintiff in <u>Schrank</u> asserts that the currency conversion fees violate certain New York consumer laws and the common laws of other states. Similarly, <u>Bildstein v. MasterCard Int'l, Inc.</u>, No. 03 Civ. 9826 (WHP) ("<u>Bildstein</u>"), which was transferred

5

to this Court on December 11, 2003, involves claims asserted under New York General Business Law ("NYGBL") Section 349, as well as for unjust enrichment (collectively, the "New York Claims").

In 2004 and 2005, this Court certified a damages class, an injunctive relief class and a TILA class, but denied Plaintiffs' motion to certify a DTPA class. All cardholders whose agreements contained arbitration clauses when the first consolidated action was filed were excluded from the certified classes, and their claims were stayed pending arbitration.

Defendants Chase and Citibank appealed this Court's denial of their motions to compel arbitration for cardholders whose agreements lacked an arbitration clause when this litigation commenced. Plaintiffs filed cross-appeals and petitions for interlocutory review of the Court's ruling that certain cardholders were subject to arbitration.

Over the course of this wide-ranging multi-district litigation, the parties conducted extensive discovery and litigated a myriad of complex issues. Plaintiffs conducted more than 100 depositions, analyzed over 500,000 documents—including documents from more than 20 third-parties, and exchanged numerous expert reports. At the time of the Settlement, the parties were on the verge of filing motions for summary judgment.

III. The Settlement

The parties to MDL 1409 engaged a former magistrate judge to mediate their dispute. Six mediation sessions were conducted between February 2005 and March 2006. The parties reached an agreement in principle during mediation and continued to negotiate the terms of the settlement until July 20, 2006, when the settlement agreement (the "Settlement Agreement") was signed. The Settlement Agreement provides for the payment of $336 million

and for certain injunctive relief running for a five-year period beginning on July 25, 2006.

(Settlement Agreement §§ 3-4.)  The injunctive provisions include the following:

1. Defendants will not contract, combine or conspire in violation of the United States antitrust laws regarding foreign transaction fees;

2. If a Bank Defendant chooses to apply foreign transaction fees on transactions on a credit card account, such Defendant will provide the following disclosures with respect to the account unless such Defendant determines that it would be prohibited by law from doing so:

   a. With each disclosure required under 12 C.F.R. §§ 226.5a(b), 226.6 or 226.9(c), the rate applicable to such foreign transaction fee; and

   b. With each disclosure required under 12 C.F.R. § 226.7, the amount, either individually or as a total, of all foreign transaction fees applied in connection with transactions covered by the periodic statement;

3. If a JP Morgan Chase or Bank of America Defendant chooses to apply foreign transaction fees on transactions on a debit card account, such Defendant will provide the following disclosures with respect to the account unless such Defendant determines that it would be prohibited by law from doing so:

   a. With each disclosure required under 12 C.F.R. §§ 205.7 or 205.8(a)(i), the rate applicable to such foreign transaction fees; and

   b. With each disclosure required under 12 C.F.R. § 205.9(b), the amount, either individually or as a total, of all foreign transaction fees applied in connection with transactions covered by the periodic statement;

4. Defendants MasterCard and Visa will not, in connection with a foreign transaction, include without separate identification or itemization any currency conversion fee in the U.S. dollar transaction amount sent to issuing members in the United States;

5. If MasterCard or Visa materially modifies its current practices with regard to calculating base exchange amounts, and such modified practices include the systematic use for that purpose of exchange rates selected by it that are outside a range of wholesale or government-mandated/managed rates, then it will require its issuing members in the United States to change their current base exchange amount disclosures to conform with its modified practices with regard to calculating base exchange amounts.

(Settlement Agreement § 4.)

7

Because the Settlement Agreement release was broader than the claims asserted in the Second Amended Complaint, Plaintiffs requested leave to file a Third Consolidated Amended Class Action Complaint. As described above, that Complaint asserts claims based on debit card fees in addition to credit card fees. (See, e.g., Compl. ¶¶ 2, 13, 16, 21, 81, 83, 85.) It also includes claims asserted under:

> state statutes relating to antitrust or unfair competition . . ., disclosure
> . . ., or consumer protection or unfair or deceptive acts or practices . .
> ., and principles of common law including . . . breach of contract,
> breach of duty, fraud, conversion, good faith and fair dealing,
> negligent representation, unconscionability and unjust enrichment . . .
> (the "State Claims").

(Compl. ¶ 1.) The Complaint specifically identifies the New York and California State Claims. (Compl. ¶ 1.) Finally, the Third Consolidated Amended Class Action Complaint alleges that Visa and MasterCard inflated the base exchange rate applied to general purpose and debit card transactions by adding a trading spread to the rate by which they translated the value of one currency to another. (See, e.g., Compl. ¶¶ 105, 130.)

IV. State Court Actions

Eleven state court actions are being settled along with MDL 1409 under separate settlement agreements. The Settlement also incorporates two California state court actions. One such action challenges the alleged failure to disclose the foreign transaction fees imposed on debit card transactions. See Shrieve v. VISA U.S.A. Inc., No. RG04155097 ("Shrieve") (Cal. Superior Ct., Alameda Cty.). The second challenges the alleged failure to disclose the foreign transaction fees on credit cards held by Californians under California's unfair competition law. See Schwartz v. VISA Int'l Serv. Ass'n, No. 822404-4 ("Schwartz") (Cal. Superior Ct., Alameda Cty.). The Schwartz class was limited to California state residents and largely overlaps with the original MDL 1409 class except for a small "stub period" that was not included in the federal

8

claims for statute of limitations reasons—from February 1, 1996 through February 28, 1997. The <u>Schwartz</u> "stub" period includes transactions that constitute less than 2% of the total revenue from the fees at issue in this action.

Rather than establish separate funds for each of these state court classes, the <u>Shrieve</u> plaintiffs were joined as parties in the Third Amended Complaint and included in the MDL Settlement Fund along with the class members for the few months covered only by <u>Schwartz</u>. In a separate agreement, plaintiff's counsel in <u>Schwartz</u>, which includes Coughlin Stoia Geller Rudman Robbins LLP ("Coughlin Stoia") and Hulett Harper & Stewart ("Hulett Harper") who are also involved in this action, resolved the issue of attorney's fees in <u>Schwartz</u>. The California trial judge in <u>Schwartz</u> found for the plaintiff and awarded $27.6 million in attorney's fees—approximately twice the loadstar—under the California fee-shifting statue, Cal. Code Civ. Proc. § 1021.5. <u>Schwatz</u> class counsel were also awarded 17.5% of any fund established in <u>Schwartz</u>. The California Court of Appeal reversed the underlying judgment in <u>Schwartz</u>, but granted plaintiff leave to amend his complaint. The case was appealed to the California Supreme Court where it was pending at the time of the Settlement, but has since been dismissed. The <u>Schwartz</u> settlement provides that VISA and MasterCard would pay $32 million in fees to resolve <u>Schwartz</u>.

V.   <u>Preliminary Approval</u>

On November 8, 2006, this Court granted preliminary approval to the Settlement. Over the objections of the <u>Schrank</u> and <u>Bildstein</u> plaintiffs, this Court granted leave to file the Third Amended Complaint and found that the Settlement was fair, reasonable, and adequate enough to warrant preliminary approval. Specifically, this Court found that the release was not overly broad because the <u>Schrank</u> and <u>Bildstein</u> state-law claims were based on identical factual

9

allegations as MDL 1409, and were properly included in the release. The Court also found that the question of whether plaintiffs' counsel in Schrank and Bildstein should have been included in the settlement negotiations was immaterial because any deficiency was harmless in light of the settlement that was reached.

As originally envisioned, the proposed Class and Settlement Notice Plan (the "Original Notice Plan") called for a direct mailing to class members, including a claim form sent either as a stand-alone mailing or as an insert in the members' credit card or bank statements. The Original Notice Plan also provided for publication of notice in newspapers and periodicals such as USA Today, The Wall Street Journal, Financial Times, Gourmet, US Weekly, National Geographic Traveler and (to the extent possible) various airline magazines. Finally, the parties were to establish a website and a toll-free telephone number as additional resources for claimants. Also, under the Original Notice Plan, claimants were required to submit documentation of their foreign currency transactions to receive a refund.

## VI. Implementing the Original Notice Plan

Following preliminary approval, the Bank Defendants sent approximately 25 million statement-insert-notices to their "Targeted Credit Cardholders," i.e., those current cardholders identified as having used a Bank Defendant's credit card for a foreign transaction. In March 2007, this Court began receiving storm warnings in the form of letters from putative class members expressing concerns over the burdensome claims procedure. Under the Original Notice Plan, class members were expected to provide detailed information about foreign currency transactions on their credit cards in order to file a claim. By order dated March 1, 2007, this Court directed the parties to respond to class member complaints and describe alternative claims methodologies that were explored but rejected during settlement negotiations.

This Court conducted a status conference with the parties on April 17, 2007, to explore avenues to improve the Original Notice Plan. The parties explained that they had considered other distribution methodologies, but that it was not be feasible for the banks to identify and calculate the claims, because the data were spread across a number of different banks with incompatible data storage and retrieval systems. This Court cautioned the parties that its principal concern at the time of any final approval would be maximizing the amount of the Settlement Fund distributed to aggrieved victims of these alleged antitrust violations.

At a hearing on May 11, 2007, this Court continued its dialogue with the parties. At that time, Class Counsel reported that while 25 million notices had been mailed and other outreach was underway, only 80,000 claims had been filed to date and none of them had been audited. Coupled with complaints that class members were discouraged from filing claims because of the onerous demands for transaction information, this low response rate—less than one third of 1%—raised the specter of a large undistributable residual fund. While recognizing there was not a one-to-one correspondence between notices sent and potential claims, the Court noted that in light of the parties' representations at the Preliminary Approval hearing that there would be between 1 and 4 million claims, the current response rate was wholly inadequate. In addition, this Court also considered the higher response rate to the class action settlement in LiPuma v. American Express, which involved foreign currency conversion fees for American Express cards.

VII. The Modified Notice Program

By Order dated May 16, 2007, this Court notified the parties that it was considering the appointment of Professor Francis E. McGovern as a Special Master to work with

the parties to develop a new notice program. This Court invited comment and heard from the parties for May 18, 2007.

On June 8, 2007, with the consent of the parties, this Court appointed Prof. McGovern as special master (the "Special Master") to work with them to review and amend, as appropriate, the plan for class notice and distribution of the net settlement fund. This Court also sought the Special Master's view concerning whether the proposed settlement agreement was fair, adequate and reasonable with respect to all class members.

Following the retention of experts, the Special Master proposed to revamp the claims process with a three-option approach to making a claim (the "Modified Notice Program"). Under Option 1, Class Members could select a flat-rate refund, set at $25, unless the Settlement Fund was oversubscribed. Under Option 2, Class Members could supply general information about their foreign travel and purchases abroad, and the Claims Administrator would calculate their claim using a specially-developed algorithm. While the algorithm was not yet devised, it would be based on a variety of data including submitted claims, samples of the Bank Defendants' foreign transaction data, and information obtained from a U.S. Department of Commerce Annual Survey of International Air Travelers. Moreover, an Option 2 claimant would not receive less than an Option 1 claimant. Finally, under Option 3, class members could supply their foreign payment card transaction data (the option that was initially implemented under the Settlement). There was also a sub-option for Option 3 claimants who were government agencies or companies (the "Agency/Company claims") to submit large volumes of transactions on a number of cards as a single claimant using a special data procedure.

On July 24, 2007, this Court convened a hearing to consider the Special Master's suggestions. The parties agreed to the re-engineering of the claims process and this Court directed them to implement the recommendations of the Special Master. The parties worked

with a plain language expert and a behavioral scientist to develop new claim forms that would elicit a higher response rate from Class Members.  There were three distinct types of notices and claim form packages: (1) those mailed directly to Class Members who were identified as having used a Bank Defendant's card for a foreign transaction; (2) those provided to Class Members upon request; and (3) those sent to individuals who had already submitted a claim.

The parties also made amendments to the Plan of Administration and Distribution to account for the new claims procedure and provide a mechanism to adjust claims in the event the amount of claims exceeded the amount of the Fund.  This revised Plan of Allocation included three stages.  In the First Stage, claims greater than $225 are reduced by 50% or to $225, whichever is greater.  If further allocation was necessary, the allocation plan provided for a Second Stage where the following payments were reduced on a pro rata basis: (1) payments that ranged between $25.01 and $224.99 and (2) payments that were previously reduced under the first reduction by less than 50 percent.  Under the Second Stage, payments may be reduced by 50 percent or to $25, whichever is greater.  If further apportionment was necessary, the allocation plan provided for a Third Stage of allocation, where all claims—including the $25 "minimum" payouts— were reduced pro rata.  The revised notices and allocation plans were approved by this Court on September 24, 2007.  Notice of the modified claims procedure was mailed in November 2007.

On March 31, 2008, this Court held a fairness hearing regarding final approval of the Settlement.  At that time, the Court heard from counsel for the parties, the Special Master, the Claims Administrator, and a number of objectors.  This Court noted it had suspended the notice process in the spring of 2007 because of emerging concerns that Class Members were not submitting claims in significant numbers and that the claims process imposed substantial burdens on them.  This Court also observed that the deadline for filing claims under Modified Notice

Program was May 30, 2008, and that the algorithm for Option 2 could not be developed until that process was complete.

This Court concluded that the best course was to proceed cautiously in the face of this uncertainty. Once the filing deadline passed, removing duplicates and the audit processes could be completed and the algorithm for Option 2 claims finalized. That information would aid the Court in assessing the fairness of Settlement and adequacy of the notice provided to the Class to insure that the interests of these absent parties were protected.

The Modified Notice Program and claims process was a resounding success. An astonishing 10,075,834 claims were filed. Of those claims, 7,157,672 are Option 1 claims, 2,601,683 are Option 2, and 316,177 are Option 3. An additional 302 Agency/Company claims were also filed. Based on the initial calculations, the total dollar value of claims is between $557,479,874 and $577,374,352. Of that total value, Option 1 claims represent $178,941,800, Option 2 claims represent $141,367,000 to $142,694,000, and Option 3 claims represent between $173,951,089 and $184,871,208. The additional sub-category of Agency/Company claims represents another $63,219,958 to $70,867,344.

This overwhelming response forced the Fund into Stage 3 of the Plan of Allocation, where all claims are reduced pro rata. Heffler, Radetich & Saitta (the "Claims Administrator") now estimates that after pro-ration Option 1 claimants will receive between $15 and $17, and the average Option 2 claim will be $35.59. As for Option 3 claimants, after pro-ration, the average refund will be approximately $268.25. Finally, the average Agency/Company refund will be $99,761.44. While these payments may be substantially smaller than claimants anticipated, it insures the fullest participation by members of the class in the recovery that has been achieved.

14

There are approximately 40,000 late-filed claims. While the majority of those claims are Option 1 claims, there are Agency/Company claims valued at approximately $19 million and Option 3 claims valued at approximately $1.2 million. In addition, there are late-filed Option 2 claims seeking reimbursement for 3,445,615 days abroad. Thus, the late-filed claims are not inconsequential.

As part of the administration of the settlement fund, the Claims Administrator conducted an extensive audit program issuing more than 9,800 audit letters to Option 2, Option 3, and Agency/Company claimants. It has received approximately 5,300 responses and completed approximately 5,200 audits. The Claims Administrator estimates that any further expansion of the audit program will only increase the Option 1 payout by 6 cents per Option 1 Claimant.

VIII. The Special Master's Supplemental Reports

On July 1, 2009, the Court received a Supplemental Report from the Special Master (the "Supplemental Report") reporting on the results of the audit program and the effect on Option 1 claimants. The Special Master reported that the overall notice program was "extremely effective" and that the response rate was nearly twice what it had been in the comparable LiPuma v. American Express litigation.[2] The Special Master noted that the audit trends identified by the Claims Administrator in his December 2008 report remained constant and that any further expansion of the audit program, beyond its current scope, would not materially change either the estimated total face value of all claims, or the estimated refund

---

[2] Specifically, the Special Master reported that in LiPuma v. American Express, No. 04 Civ. 20314 (S.D. Fla.), claim forms were sent to 8,822,803 potential class members and approximately 1,000,647, or 11.34%, actually filed a claim form with the claims administrator. In MDL 1409, out of 38,643,848 potential class members, 10,078,866, or 26.08%, were filed with the Claims Administrator.

amount for Option 1 Claimants. Thus, he recommended that the Court authorize the Claims
Administrator to complete the current audit process. The Special Master also agreed with the
Claims Administrator that claimants who did not respond to audit letters should be rejected.
Rejecting all non-responding claimants and applying all three pro-ration mechanisms, the Special
Master also agreed with the estimate that the refund amount for Option 1 Claimants would be in
the range of $15 to $17.

      The Special Master recommended that the more than 40,000 late-filed claims be
rejected, because there were more than 10 million timely claims. The Special Master also
recommended that so-called "Travel Agency" claims by three travel booking companies (Orbitz,
Travelocity, and Priceline) totaling $473,761,462 in charge volume be denied because traveling
consumers, not the agencies paid the foreign transaction fees. Finally, the Special Master
recommended that the Court approve the algorithm for Option 2 claims developed by the experts
retained by the Special Master.

      The class notice describes Option 2 as a "Total Estimation Refund based on
typical spending during travel." The Option 2 algorithm was developed by Analysis Research
and Planning Corporation ("ARPC"). ARPC conducted field testing and interviews with
potential claimants and determined that, though claimants had difficulty estimating their total
expenditures overseas, they could readily remember the lengths and purposes of their trips.
ARPC then began working on an algorithm that would compare claimants to U.S. residents who
traveled outside of the U.S. between 1996 and 2006 for similar purposes and whose experience
and spending patterns were captured in government-sponsored surveys from the United States,
Canada, and Mexico. ARPC then used the statistical median to estimate spending patterns
because averages can be influenced by extremely high values, and thus, not represent the
behavior of the majority of travelers.

The Option 2 algorithm has five steps.  First, the algorithm allocates claimant days between the different categories (business, visiting friends or relatives, or leisure) based on claimant responses.  Second, the algorithm estimates the typical daily foreign spending for each type of travel based on the governmental surveys of travelers, and adjusts this typical daily spending for expenditures using Travelers Checks, credit cards not covered by the Settlement, and cash, as reported by travelers in these surveys.  The third, fourth, and fifth steps are arithmetic calculations.

The proposed Option 2 Algorithm was also adjusted for claimants with "atypical" numbers of travel days—i.e., extensive foreign travel or living abroad.  The median number of travel days reported by the 2,515,286 Option 2 claimants was 82, and the largest number claimed is 3,934.  After considering a number of options and discussing the matter with the parties, the Option 2 algorithm was adjusted for atypical travel using a "Discount Model."  Under the Discount Model, the daily spending estimate for the traveler generated by Step 2 of the algorithm is reduced on each day in excess of 82 days (the median number of days for all claimants).  The amount the daily spending allowance is reduced increases linearly for every travel day in excess of 82 up to day 999.  From day 1000 up to day 3,934 (the greatest number of days spent abroad by a class member), the per-day reduction is fixed at 10%.

On July 2, 2009, this Court ordered class counsel to serve the Supplemental Report and its exhibits on all parties and objectors, post it on http://www.ccfsettlement.com, the website run by the Claims Administrator, and invited comments from the public on the recommendations contained in the Supplemental Report.  During a four week comment period, this Court received 25 comments.  Class Counsel and the Special Master responded to the comments.  In a Second Supplemental Report dated August 5, 2009, the Special Master also notified the Court of a conflict that had arisen since offering his recommendations that required

17

his recusal on the Travel Agency Claims.  On August 6, 2009, this Court held a hearing on the Supplemental Report and the comments regarding the Supplemental Report.

## IX.  Travel Agency Claims

Following the August 6, 2009 hearing, Priceline submitted further documentation to support its claims for payment under the Settlement Fund, and the parties filed additional briefing.  Under Priceline's agreements with Wright Express Financial Services Corporation ("Wright"), its issuer bank, Wright extends a multi-million dollar credit line to Priceline secured with a stand-by letter of credit, which is accessed through the creation of "sub-accounts." (Plaintiffs' Submission dated Sept. 3, 2009, Ex. A: Commercial Credit Agreement For Master Account and MasterCard Sub-Accounts ("Name Your Own Price Hotel Service") dated Aug. 28, 2000 ("2000 Agreement") at 1, 3, 6; Ex. B: Commercial Credit Agreement For Master Account and MasterCard Sub-Accounts ("Name Your Own Price Hotel Service") dated Sept. 2, 2003 ("2003 Agreement") at 1, 3.)  Each sub-account has its own MasterCard number.  (2000 Agreement at 1, 4, 5; 2003 Agreement at 1, 3, 4.)  Under the 2000 Agreement, there were more than 300,000 "sub-accounts" assigned to Priceline, and under the 2003 Agreement, there is no set number of "sub-accounts."  (2000 Agreement at 4; 2003 Agreement.)  The sub-accounts allow Priceline to pay individual merchants using the credit facility Wright has granted through the conventional MasterCard system.  The Agreements provide that Priceline will pay the 1% fee charged by MasterCard for the processing of foreign currency transactions, but also contain a number of unique terms.  For example, the Agreements require that Priceline provide a certain minimum volume of business per month and if Priceline exceeds certain threshold amounts of business it will receive an increasing rebate on so-called "interchange" transaction charges. (2000 Agreements at 7-8; 2003 Agreement at 6.)  The Agreements also make provision for

18

adjustment of the financial terms between Wright and Priceline in the event that MasterCard modifies its contractual relationships with Wright.   (2000 Agreement at 13; 2003 Agreement at 11.)

## DISCUSSION

### I. Final Approval

A district court must determine whether both the negotiating process leading to a settlement and the settlement itself are fair, adequate and reasonable.  D'Amato v. Deutsche Bank, 235 F.3d 78, 85 (2d Cir. 2001).

### A. Negotiations

Where a settlement is the "product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation," the negotiation enjoys a "presumption of fairness." In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000).  Class and Defense Counsel have extensive experience with class actions, and the settlement was the result of extensive negotiations and mediation.  See In re Initial Pub. Offering Sec. Litig., 226 F.R.D. 186, 194 (S.D.N.Y. 2005) (finding the use of an experienced mediator supports fairness).  Accordingly, the Court finds the negotiating process was fair, adequate, and reasonable.

### B. Settlement

In determining whether a settlement is substantively fair, adequate and reasonable, the Court must consider the following factors: "(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7)

the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974). "[N]ot every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances." In re Global Crossing Sec. and ERISA Litig., 225 F.R.D. 465, 456 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

### 1. Complexity, Expense and Likely Duration of the Litigation

"[A]ntitrust cases, by their nature, are highly complex." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 122 (2d Cir. 2005); see also Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought"). This action, now in its eighth year, involved prolonged fact and expert discovery, motions to dismiss, motions to compel arbitration, class certification, multiple motions for reconsideration, and interlocutory appeals. Moreover, Defendants complicated the antitrust issues by interjecting complex questions about the reach of arbitration clauses embedded in cardholder agreements. With those issues still percolating in the Court of Appeals, it is likely that this multi-district litigation would have continued for years to come, with an uncertain outcome. Accordingly, this factor weighs strongly in favor of approval.

### 2. Reaction of the Class

The 2,910 members opting out and 76 objectors constitute a small fraction of one percent of the 10,075,834 claims filed and 38 million notices that were mailed by Class Counsel. Accordingly, the minimal reaction by the class is extraordinarily positive, despite the objections filed, and weighs in favor of settlement. See D'Amato, 236 F.3d at 86-87 (finding 18 objections out of 27,883 notices weighed in favor of the settlement); see also In re Prudential Ins. Co. of

Am. Sales Practice Litig. Agents Actions, 148 F.3d 283, 318 (3d Cir. 1998) (finding 19,000 opt-outs and 300 objections out of 8 million claims to favor settlement).  Finally, some objectors claimed that the service requirement for objections (certified mail, overnight mail, or by hand) was burdensome for small claimants.  However, the number of claimants with large claims (the average Agency/Company claim is approximately $99,000) and the common interests of the class diminish those concerns.

### 3.  Stage of Proceedings and Amount of Discovery

Although discovery was complete and various classes had been certified when the parties agreed to the Settlement, motions for summary judgment had not yet been filed and a host of interlocutory appeals were pending.  But the parties fully understood the factual landscape and the uncertainties confronting them.  See In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389, 400 (D.N.J. 2006) ("Where this negotiation process follows meaningful discovery, the maturity and correctness of the settlement becomes all the more apparent.").  Because the parties' respective theories of the case were well-developed and known, this factor weighs in favor of approval of the Settlement.

### 4 and 5.  Risks of Establishing Liability and Damages

"The complexity of Plaintiff's claims ipso facto creates uncertainty."  Park v. Thomson Corp., No. 05 Civ. 2931 (WHP), 2008 WL 4684232, at *4 (S.D.N.Y. Oct. 22, 2008). Plaintiffs did not have the benefit of a Government investigation, and laboriously knitted this case together with painstaking attention to detail.  Thus, a settlement of $336 million and the injunctive relief represent a extraordinarily significant recovery.

Assuming liability could be established, proving damages in this action would have required significant expert testimony and analysis.  A trial on these issues could have confused even a sophisticated jury.  Also, a settlement or judgment in any one of the numerous

state court actions pending around the country, could have led to a reduction of damages in this case. Moreover, there was the possibility that the Class could have been decertified or modified as the litigation continued. See In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68, 89 (E.D.N.Y. 2000) ("If factual or legal underpinnings of the plaintiffs' successful class certification motion are undermined once they are tested under a more stringent standard . . . a modification of the order, or perhaps decertification, might be appropriate."). Therefore, these factors weigh in favor of approval of the Settlement.

### 6. Risks of Maintaining the Action Through Trial

Absent settlement, the action would have continued for years with motions for summary judgment, interlocutory appeals, a possible trial, and the inevitable post-trial motions and further appeals. Accordingly, this factor also weighs in favor of approval.

### 7. Ability of Defendants to Withstand a Greater Judgment

Although the Defendants confronted multiple suits which could have exacerbated the total amount owed if judgments were rendered against them in each action, there is no evidence that they could not have withstood a greater judgment. Moreover, despite the recent financial troubles of some of the Defendants, the Defendants remain companies of substantial means. Thus, this factor weighs against the settlement.

### 8 and 9. Range of Reasonableness of Settlement in Light of Best Possible Recovery and Risks of Litigation

While the $336 million settlement is significantly less than the estimated $3.8 billion in total credit and debit foreign transaction fee revenue that Defendants collected between February 1996 and the date of preliminary approval, that total revenue estimate substantially exceeds any best case recovery. Class Counsel estimates that currency conversion fees at issue in this litigation are approximately $1.1 billion. In addition, there was significant dispute

between the parties about the proper measure of damages. Plaintiffs' damages theory was based on disgorgement of the entire amount of revenue derived from the fees. This damages theory was subject to a serious challenge from Defendants' experts. See In re NASDAQ Market Makers Antitrust Litig., 187 F.R.D. 465, 476 (S.D.N.Y. 1998) ("[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial or on appeal.").

Moreover, this Settlement also includes significant changes in the practices by the major banks, which cannot be ignored.[3] See In re Initial Pub. Offering, 226 F.R.D. at 198 (noting that "this settlement is not solely . . . about monetary recovery."). The Settlement includes improved disclosure obligations which enhance competition by giving card holders the ability to compare foreign currency conversion fees. Thus, these factors weigh strongly in favor of approval.

Accordingly, weighing the Grinnell factors, this Court finds the settlement amount and other relief fair and reasonable.

---

[3] This Court would prefer that the injunctive relief concerning disclosure requirements continue for at least five years after a judgment is entered. However, the parties agreed that the five-year limitation would run from the date of the Settlement on July 25, 2006, and this Court's power to modify the Settlement is extremely limited. See Cty. of Suffolk v. Long Island Lighting Co., 14 F. Supp. 2d 260, 269-70 (E.D.N.Y. 1998) ("The court's discretion rarely, if ever extends to modifications which directly contradict the fundamental expectations under the original settlement."); see also Berger v. Heckler, 771 F.2d 1559, 1568 (2d Cir. 1985) ("The court is not entitled to expand or contract the agreement of the parties."). This Court discerns no good reason for discontinuing the transparency provisions in July 2011. If the Defendants fail to continue these reasonable disclosures, then consumers and government regulators should raise the issue.

C.  The Objections

A number of objections to the Settlement are primarily directed at the amount of the requested attorney's fees and will be considered in the discussion of the attorney's fee request.  As for the major substantive objections, they fall into eight categories.[4]

1.  The Government

Because it is not a member of the class and lacks standing to object, the Government submits "comments" on the Settlement.  The Government's comments focus on the provisions in the Settlement that allow claimants to obtain direct payment for their claims, despite the fact that they may have been reimbursed by the Government for their charges.  The Government asserts that such claimants no longer own the claims, rather the Government does.  However, the Settlement includes provisions that allow Agencies or Companies, including Government agencies, to submit these types of claims themselves and receive direct payment.  As for the Government's comment that parties be required to sign a certification that they were not reimbursed by the Government for the charges at issue, this proposal is burdensome because it will almost certainly generate high administrative costs for the Claims Administrator.  In the end, the Government has not shown that it even considered much less pursued a less burdensome approach.

---

[4]  This Court notes, but does not consider broad unsupported objections because they "are of little aid to the Court."  In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 378 (D.D.C. 2002).  Several of the objectors feel they are entitled to more than they are offered under the Settlement, but generously offer to separately settle their claims for amounts ranging from $3,300 to $8,000.  However, these objections are without merit.  See Thomas v. Albright, 139 F.3d 227, 234 (D.C. Cir. 1998) ("The court should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial.").

    2.  <u>The Breadth of the Release</u>

       The plaintiffs in some of the related litigations pending before this Court object to the breadth of the release in the Settlement, and to their exclusion from the settlement negotiations. This Court considered and rejected those objections in its preliminary approval of the Settlement. The current objectors offer no reason to revisit that decision now. <u>See</u> <u>Currency Conversion Fee</u>, 2006 WL 3247396, at *3-4.

    3.  <u>The Inclusion of State Court Actions</u>

       Several of the objectors object to the inclusion of debit card holders and the members of the <u>Schwartz</u> class in this action. However, the <u>Schwartz</u> class and the debit card holders were injured by the same conspiracy, were subject to similar fees, and the effect of their inclusion is small relative to the overall settlement. Thus, this Court finds their inclusion in the Settlement Class appropriate. <u>See</u> <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 531 (3d Cir. 2004) (noting nothing inappropriate to including persons who suffered the same economic harm and from same actions).

    4.  <u>Reimbursement of the Defendants</u>

       Several of the objectors object to Section 3(g) of the Settlement, which provides that any leftover administrative costs above $10 million will revert to the Defendants. Those objections are moot because administrative costs already exceed $18 million.

    5.  <u>Notice</u>

       A number of objectors object to the notice provided in this case. However, the Modified Notice Program was incredibly effective. In fact, "[a] compilation of data from other consumer cases in which there have been similar numbers of potential beneficiaries reveal that this is an exceptionally high response rate." <u>See</u> Francis E. McGovern, <u>Second-Generation Dispute System Design Issues In Managing Settlements</u>, 24 OHIO ST. J. ON DISP. RESOL. 53, 58

(2008) (with graphic comparing other class actions). Accordingly, those objections are without merit.

### 6. Claims Process

Several of the objectors assert that the Defendants should provide all of the relevant data and the Claims Administrator should simply calculate the claims automatically. Such a process was considered and rejected during the negotiations as too costly and complicated to implement. Given the overwhelming participation of Class Members in the Settlement and the small number of Option 3 claims filed, it appears that the modified claims procedure worked as intended and the results exceeded the expectations of the experts. Accordingly, the objectors concerns about the claims process are without merit.

### 7. Coughlin Stoia and Skadden Arps

Several objectors point to a conflict of interest between one of Plaintiffs' law firms, Coughlin Stoia, and Skadden Arps, one of the Defendants' law firms. The purported conflict arises from Skadden Arps' representation of several Coughlin Stoia partners in an unrelated proceeding. See In re Chiron Corp. Sec. Litig., No. C-04-4293-VRW, 2007 WL 4249002 (N.D. Cal. Nov. 30, 2007). However, this is not a reason to reject the Settlement. Unlike Chiron, Coughlin Stoia and Skadden Arps were only one of a number of counsel negotiating the Settlement in this litigation, and other law firms took the laboring oars. And here, in contrast to Chiron, a class has been certified prior to settlement, allowing the Court to rigorously test the parties' theories before the Settlement. Accordingly, this Court finds that these objections are without merit.

### 8. The Schwartz Settlement Fee Payment

A number of objectors object to the separate Schwartz settlement under which Visa and MasterCard have agreed to pay $32 million including attorney's fees to several of the

law firms representing Plaintiffs. The objectors argue that the Schwartz attorney's fees should

be included in the fund in this case, with this Court deciding whether to award the money to the

law firms. While the Schwartz class members are included in the MDL 1409 fund, the two

actions proceeded separately. The Schwartz action went to trial, involved substantial efforts by

counsel in that case, and involved a fee award from the California state court judge under a

California statute. None of the hours expended by counsel in the Schwartz case are included in

Class Counsel's loadstar here. The Schwartz fee settlement is not a reason to reject the

Settlement or adjust the fee award.

Accordingly, this Court approves the Settlement.

III. Plan of Allocation

"To warrant approval, the plan of allocation must meet the standards by which the

. . . settlement was scrutinized—namely, it must be fair and adequate." Maley v. Del Global

Techs. Corp., 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002). "District courts enjoy broad

supervisory powers over the administration of class-action settlements to allocate the proceeds

among the claiming class members . . . equitably." In re Agent Orange Prod. Liab. Litig., 818

F.2d 179, 181 (2d Cir. 1987) (internal quotation marks and citation omitted). "[D]istrict courts

cannot rely solely on 'the arguments and recommendations of counsel' in evaluating propriety of

class settlements." Agent Orange, 818 F.2d at 182 (quoting Plummer v. Chem. Bank, 668 F.2d

654, 659 (2d Cir. 1982)).

This Settlement reasonably distributes the entirety of the Fund to Class Members.

As for the concerns over the algorithm for Option 2, the Class Notice provides adequate details

about how claims would be calculated generally, and the Special Master worked with an

independent consulting firm to develop the algorithm based on the responses received. Finally,

many objectors challenge a provision in the Settlement providing that any unspent administrative monies and accrued interest be returned to the Defendants.  These concerns are moot because, as noted earlier, the $18 million set aside for administration costs has been spent.  Accordingly, this Court finds that the Settlement enables as many Class Members as possible to receive a fair share of the Settlement.  Accordingly, the allocation plan is approved.

IV.  Specific Claims Issues

    A.  Late Claims

        "The determination whether to allow the participation of late claimants in a class action settlement is essentially an equitable decision within the discretion of the court . . . ."  In re Crazy Eddie Sec. Litig., 906 F. Supp. 840, 843 (E.D.N.Y. 1995).  The Special Master recommends that the late claims be denied.  Given the length of time—16 months—that claimants were given to submit claims and the lengthy claims approval and appeal process, allowing the substantial number and dollar amount of late claims would be prejudicial.  Accordingly, the late filed claims should not be included for Settlement disbursement.

    B.  Travel Agency Claims

        Of the Agency/Company claims submitted, three claims were submitted by travel booking companies that reserve hotel rooms for travelers (Priceline, Orbitz, and Travelocity).  These claims total approximately $4,750,000.  Priceline, Class Counsel and the Defendants have briefed whether Priceline's claims should be included in the Settlement.  Orbitz and Travelocity have not submitted additional information.

        The "Damages" class for purposes of this Settlement is defined as:

        [A]ll Persons who or which were holders of United States-issued MasterCard- or Visa-branded Credit or Debit Cards or United States-issued Diners Club-branded Credit Cards and made a Foreign Transaction from February 1, 1996 to the date of Preliminary Approval [November 8, 2006].

In re Currency Conversion Fee Antitrust Litig., MDL No. 1409, Implementing Order Granting
Preliminary Approval (Nov. 8, 2006) (Docket No. 472), at 3.

> The Settlement Agreement defines Credit Cards as:
>
> [A]ll United States-issued Visa-, MasterCard, and Diners Club-branded payment
> cards that extend to cardholders a line of credit or which require payment of the
> amount due by a due date.  For avoidance of doubt, soley for purposes of use
> herein, Credit Cards includes, without limitation, cards commonly known as
> credit cards, charge cards, corporate cards, company cards, and purchasing cards.

Settlement Agreement § 2(m)

The parties' principal dispute is whether Priceline can be characterized as a
"holder" of credit cards.  Specifically, Plaintiffs contend that Priceline engages in a unique credit
and payment mechanism which is not the type of credit card transaction and credit card
relationship contemplated by this case.  Priceline and the Defendants respond that the definitions
in the Settlement Agreement are very broad and include Priceline.  While this Court agrees that
the definitions in the Settlement Agreement are broad, Priceline's unique payment facility with
Wright is not the type of arrangement included in this case.  The unique terms and structure of
that payment facility—its rebates, its hundreds of thousands of credit card numbers, its flexible
terms—make it clear that Priceline is not a holder of a MasterCard-branded credit card within the
meaning of the Settlement Agreement.  Indeed, while Priceline is correct that there is no
requirement that the class members be consumers, sophisticated payment facilities like that
utilized by Priceline are simply far outside of any reasonable concept of a "holder" of a credit
card, and therefore dehors the Settlement Class.  Accordingly, Priceline is not a member of the
Settlement Class and its claim is denied.  This Court notes that Priceline is not without remedy.
Because it is not a member of the class, it is free to file its own lawsuit.

As for Orbitz and Travelocity, neither of them presented any evidence that they
actually paid the currency conversion fee.  Rather, as Plaintiffs' counsel notes, for these

claimants, the traveling consumers, who book hotel rooms over the internet through these travel booking companies, are charged for the cost of the room, plus a mark-up. Because these claimants bill their customers on a pre-existing cost-plus contract basis, they have passed along any overcharge and therefore, they have not been damaged. See Illinois Brick Co. v. Illinois, 431 U.S. 720, 732 n.12 (1977) (noting that a "pre-existing cost-plus contract makes easy the normally complicated task of demonstrating that the overcharge has not been absorbed by the direct purchaser"). Accordingly, this Court agrees with Plaintiffs' that the claims of Travelocity and Orbitz should also be disallowed.

     C. Algorithm for Option 2 Claims

        The Special Master recommends that this Court adopt the algorithm proposed in the report of Thomas Florence, President of Analysis, Research, and Planning Corp. ("ARPC") dated July 15, 2008 (the "Florence Report"). This Court has reviewed the Florence Report and finds it thorough and well-reasoned. This algorithm is a reasonable approach and consistent with the general algorithm outline disclosed in the notice to the class. Moreover, the algorithm was designed using independent data, and based on typical usage. Many of the comments received in response to the Supplemental Report provide only anecdotal evidence of usage and raise concerns reflecting usage that is far from typical—people spending years abroad. Accordingly, this Court adopts the recommendations of the Special Master and approves the algorithm as proposed by Dr. Florence.

     D. Audits

        The Special Master notes that the Claim Administrator has engaged in an extensive audit of the Option 3 and Agency Claims. The Special Master recommends that the Claims Administrator complete the current audit process, but expand it no further because additional auditing is unlikely to materially change the payment to the vast majority of claimants.

This Court agrees those recommendations and adopts them. Additionally, the Special Master recommends that claimants who did not respond to the audit request sent to them have their claim disallowed. This Court agrees.

## V.  Attorney's Fees, Expenses and Lead Plaintiffs' Incentive Awards

### A.  Attorney's Fees

Plaintiff's attorneys ("Class Counsel") seek $86,075,000 in attorney's fees, approximately 25.5% of the Fund. This amount would compensate for a total of 76,877.94 hours billed as of January 15, 2008, mostly billed by partners and senior associates, and require a multiplier of 2.69 be applied to a loadstar of $31,990,501.60. The blended hourly rate of some of the law firms was above $500. Class Counsel reduced those blended rates to $490 per hour. This resulted in a final blended hourly rate of $416.

Class Counsel submitted claims on behalf of 31 law firms. 23 of those firms billed fewer than a thousand hours of attorney time and 2 firms billed fewer than 20 attorney hours. With so many firms dabbling in this litigation, duplication was inevitable, and therefore, the loadstar is almost certainly inflated. Nevertheless, the bulk of the professional time was billed by two highly competent and experienced law firms: Berger & Montague (34,005.9 hours) and Coughlin Stoia (15,396.25 hours). Of the 76,877.94 hours, approximately 62,000 hours were attorney hours and 15,000 hours were para-professional hours. The attorney hours break down (as best as this Court can determine) to approximately 42,000 partner hours and 20,000 associate hours.

In calculating a reasonable attorney's fee, this Court has discretion to choose between the lodestar method and the percentage of recovery method. In re WorldCom, Inc. ERISA Litig., No. 02 Civ. 4816 (DLC), 2005 WL 3101769, at *7 (S.D.N.Y. Nov. 21, 2005).

31

However, "[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." WorldCom, 2005 WL 3101769, at *7 (quoting Wal-Mart, 396 F.3d at 121). This "spares the court and the parties the 'cumbersome, enervating, and often surrealistic process' of loadstar computation." In re Visa Check/MasterMoney Antitrust Litig., 297 F. Supp. 2d 503, 520 (E.D.N.Y. 2003) (quoting Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000)). Even where the percentage method is used, the lodestar method remains useful as a "cross-check on the reasonableness of the requested percentage." Goldberger, 209 F.3d at 47, 50.

Under the percentage of recovery method, the Court considers the Goldberger factors and sets a percentage of the settlement as a fee "based on scrutiny of the unique circumstances of each case." Goldberger, 209 F.3d at 47, 51-53. Under the lodestar method, the Court examines the fee petition to ascertain the number of hours reasonably billed to the plaintiff and multiplies that figure by an appropriate hourly rate and a multiplier. Goldberger, 209 F.3d at 47. "[A]s a rule, 'post-Goldberger courts . . . have generally refused multipliers as high as 2.03.'" In re Merrill Lynch & Co. Research Reports Sec. Litig., No. 02 MDL 1484 (JFK), 2007 WL 4526593, at *21 (S.D.N.Y. Dec. 20, 2007) (quoting In re Twinlab Corp. Sec. Litig., 187 F. Supp. 2d 80, 87 (E.D.N.Y. 2000)). Under either method, the Court is guided by the following factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. Goldberger, 209 F.3d at 50. Moreover, in megafund cases, courts have "traditionally accounted for these economies of scale by awarding fees in the lower ranges." Goldberger, 209 F.3d at 52.

1. <u>Time and Labor Expended by Counsel</u>

Class Counsel engaged in lengthy and intensive discovery, producing and reviewing hundreds of thousands of documents, and deposing more than a hundred witnesses. Class Counsel briefed and argued motions to dismiss, compel arbitration, class certification and motions for reconsideration. Class Counsel participated in settlement negotiations, including a lengthy mediation, and prepared two rounds of notification to class members. Class Counsel will also spend additional hours after final approval of this Settlement working through the claims process with Class Members. This Court finds the time and labor of Class Counsel has been and will continue to be significant.

2. <u>The Magnitude and Complexities of Litigation</u>

This Court has already noted that antitrust cases are typically complex, and this case has been no exception. There was no Government investigation. Thus, "this is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill." <u>In re Gulf Oil/Cities Serv. Tender Offer Litig.</u>, 142 F.R.D. 588, 597 (S.D.N.Y. 1992). Class Counsel did their work on their own with enormous attention to detail and unflagging devotion to the cause. Many of the issues in this litigation, in particular the issues regarding arbitration clauses, were unique and issues of first impression. While Class Counsel were familiar with antitrust law, this action was substantially more complicated than the average large antitrust action.

3. <u>Risk of Litigation</u>

The risk of the litigation is "perhaps the foremost factor to be considered in determining whether to award an enhancement." <u>Goldberger</u>, 209 F.2d at 54 (internal citations and quotations omitted). Prior to settlement, there were still significant hurdles facing this litigation. First, there was the issue of arbitration. Defendants had succeeded in limiting the

class based on this issue. Second, the parties had not yet moved for summary judgment. Third, damages were uncertain. Finally, there were appeals pending regarding class certification. Thus, without even considering a trial, there were significant risks remaining in this litigation.

### 4. Quality of Representation

Class Counsel provided extraordinarily high-quality representation. This case raised a number of unique and complex legal issues including the effect of arbitration clauses on consumer antitrust class actions, and collusive activity in the context of joint ventures. The law firms of Berger & Montague and Coughlin Stoia were indefatigable. They represented the Class with a high degree of professionalism, and vigorously litigated every issue against some of the ablest lawyers in the antitrust defense bar.

### 5. The Requested Fee in Relation to Settlement

"To avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases." In re Interpublic Sec. Litig., No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004) (internal citations and quotation marks omitted). The proposed attorney's fee of 27.5% of the net fund is on the high end of the range of fee awards in other recent class actions in this Circuit, compare In re Veeco Instruments Inc. Sec. Litig., No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) (awarding attorneys' fees of 30% of a $5.5 million fund); In re Oxford Health Plans, Inc. Sec. Litig., MDL 1222 (CLB), slip op., at 7 (S.D.N.Y. June 12, 2003) (awarding 28% of a $300 million fund); In re Priceline.com, Inc. Sec. Litig., No. 00-1884 (AVC), 2007 WL 2115592, at *5 (D. Conn. July 20, 2007) (awarding 30% of an $80 million fund) with Goldberger, 209 F.3d 43 (affirming the district court's award of 4% of a $54 million settlement); In re Air Cargo Shipping Serv. Antitrust Litig., 06 MDL 1775 (JG), 2009 WL 3077396, at *16 (E.D.N.Y. Sept. 25, 2009) (awarding 15% of $85 million fund); In re Elan Sec.

Litig., 385 F. Supp. 2d 363 (S.D.N.Y. 2005) (awarding 12% of a $75 million settlement);

Carlson v. Xerox Corp., 596 F. Supp. 2d 400, 413-14 (D. Conn. 2009) (awarding 16% of $750

million fund); Denney v. Deutsche Bank, 230 F.R.D. 317, 352-54 (S.D.N.Y. 2005) (awarding

15.5% of $81.5 million fund); In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229, 236

(S.D.N.Y. 2005) (awarding 3% of $300 million settlement).

      6.  Public Policy Considerations

      While public policy favors "the award of reasonable attorney's fees," courts must

also "guard against providing a monetary windfall to class counsel to the detriment of the

plaintiff class." In re NTL Inc. Sec. Litig., No. 02 Civ. 3013 (LAK), 2007 WL 1294377, at *8

(S.D.N.Y. May 2, 2007) (internal quotations omitted).

      Applying the Goldberger factors, this Court concludes that a total attorneys' fee

of $51,250,000 is reasonable and appropriate.  This represents a recovery of approximately

15.25% of the Fund without interest and when cross-checked against the loadstar results in a 1.6

multiplier.  This award should adequately compensate Class Counsel for their time and effort, the

risks they faced in this case, and the high quality of their representation, and is within the range

of awards in "mega-fund" cases.  See, e.g., Carlson, 596 F. Supp. 2d at 413-14 (awarding 16% of

$750 million fund); In re Air Cargo Shipping Serv. Antitrust Litig., 06 MDL 1775 (JG), 2009

WL 3077396, at *16 (E.D.N.Y. Sept. 25, 2009) (awarding 15% of $85 million fund); In re Qwest

Commc'n Int'l Secs. Litig., No. 01-cv-01451-REB-CBS, 2006 U.S. Dist. LEXIS 71267 at *23

(D. Colo. Sept. 29, 2006) (awarding 15% of $400 million fund); In re Freddie Mac Sec. Litig.,

No. 03 Civ. 4261 (JES), slip op., at 1 (S.D.N.Y. Oct. 27, 2006) (awarding 20% of a $410 million

fund).

      A number of the objectors direct their fire at the magnitude of the attorney's fee

award.  Many of those objectors asked that the Court audit Class Counsel's loadstar and reduce

the fee. See United States ex rel. Miller v. Bill Harbert Int'l Const. Inc., 601 F. Supp. 2d 45, 50-51 (D.D.C. 2009) ("Culling through the minutiae of the time records each time a fee petition is submitted in this case would be impossible 'lest [the Court] abdicate the remainder of its judicial responsibilities for an indefinite period.'" (quoting Cobell v. Norton, 407 F. Supp. 2d 140, 166 (D.D.C. 2005))).   That is simply impracticable here and not necessary in light of the Court's use of the percentage of recovery method. See Gulf/Cities Serv., 142 F.R.D. at 596-97. There can little doubt that the effort expended by Class Counsel in this litigation was significant and of the highest quality.

Moreover, this Court's downward adjustment from Class Counsel's original fee request will redound to the benefit of the Class.  The estimated payments to Class Members rested on the assumption that the requested attorney's fee—25.5% of the Fund—would be awarded to Class Counsel.  However, with a 15.25% of the Fund fee award, the payouts to Class Members should be at the higher end of the estimated ranges.

As for the Schwartz settlement, as this Court explained above, it is irrelevant here and not a reason to further adjust the fee award.  Accordingly, the various objections to the magnitude of the requested fee award have been addressed by this Court.

Finally, Class Counsel have requested a pro rata share of the interest earned on the corpus of the Fund, which has been held in a Court Registry Investment System account since preliminary approval of the Settlement on November 8, 2006.  This Court declines to award interest on a fee that had not been determined.  Nevertheless, Class Counsel will be entitled to a pro rata share of the interest earned on their award from the date of this Memorandum and Order.

B. Expenses

Class Counsel additionally seek reimbursement of $3,708,072 in expenses. "Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients." Mitland Raleigh-Durham v. Myers, 840 F. Supp. 235, 239 (S.D.N.Y. 1993). Given the magnitude of this case, its national scope, its long duration, and the extensive and expensive expert discovery conducted by the parties, this Court is satisfied that the expenses incurred were reasonable. Accordingly, this Court grants Class Counsel's motion for reimbursement of expenses and authorizes a payment of $3,708,072.

VI. Incentive Award

Class Counsel seek an "Incentive Award" for the class representatives in this case and some of the related cases. Counsel requests the requests incentive awards totaling $350,000 as follows: (i) $45,000 for Plaintiff Robert Ross; (ii) $35,000 each to Plaintiffs S. Byron Balbach, Jr. and Michael H. Oshry; (iii) $19,000 each to Plaintiffs Jeanne H. Balbach, Leslie Cooper, Cherie R. Donald, Andrea Kune, Camille LaPlaca-Post, Herve Senequier, Randal Wachsmuth, and the Estate of Robert Donald; (iv) $10,000 each to Plaintiffs Kayta George, David Shrieve, Tara Rado, Anthony Ralphs, David Ultan, Woodrow W. Clark, and Pamela Meyerson; (v) $5,000 each to Plaintiffs Shannon Mattingly and Timur Nusratty; and (vi) $3,000 to Jeffrey Zakem. "The amount of the incentive award is related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911 (HB), 2005 WL 1041134, at *3 (S.D.N.Y. May 5, 2005).

In this case, while the number of class representatives is large, it was required by orders of this Court. See Currency Conversion Fee, 224 F.R.D. at 570-71; Currency Conversion

Fee, 361 F. Supp. 2d at 246-48. Further, the Court notes that while recoveries under Options 1 and 2 of the plan will be far less than the proposed incentive awards, many of the Option 3 recoveries will be quite sizeable. Moreover, these incentive awards are within the range of what other courts have found to be reasonable, although on the higher end. See, e.g., Dornberger v. Metro. Life Ins. Co., 203 F.R.D. 118 (S.D.N.Y. 2001) (noting case law supports payments of between $2,500 and $85,000 to representative plaintiffs in class actions); In re Janney Montgomery Scott LLC Fin. Consultants Litig., No. 06-3202 (S), 2009 WL 2137224, at *12 (E.D. Pa. July 16, 2009) (awarding $20,000 for each named plaintiff). Also, this amount is approximately 0.1% of the total Fund, which is similar to other cases. See Roberts v. Texaco, Inc., 979 F. Supp. 185 (S.D.N.Y. 1997) (incentive award of 0.18% of the settlement fund).

　　　　　The Class Representatives faced considerable risk in this action. The arbitration clauses in many of their cardholder agreements could have required their claims to be arbitrated, where they likely would bear the cost of any loss—a substantial personal risk not normally faced by most class representatives. However, this Court finds that awards of $35,000 to $45,000, in what is essentially a consumer class action, are too large. The vast majority of claims are small, and while the Class Representatives faced risks, the proposed awards are on the higher end of awards that this Court was able to find. Accordingly, given the substantial time and effort the class representatives incurred, including providing written discovery, being deposed, reviewing and editing submissions, and attending hearings; the relatively small amount of the award as compared to the total fund; the potential risks of arbitration; and the fact that Class Members were notified of these awards, this Court awards the following modified the incentive awards: (1) $15,000 for Plaintiff Robert Ross; (ii) $10,000 each to Plaintiffs S. Byron Balbach, Jr. and Michael H. Oshry; (iii) 5,000 each to Plaintiffs Jeanne H. Balbach, Leslie Cooper, Cherie R. Donald, Andrea Kune, Camille LaPlaca-Post, Herve Senequier, Randal Wachsmuth, and the

Estate of Robert Donald; (iv) $1,000 each to Plaintiffs Kayta George, David Shrieve, Tara Rado, Anthony Ralphs, David Ultan, Woodrow W. Clark, and Pamela Meyerson; (v) $500 each to Plaintiffs Shannon Mattingly, Timur Nusratty, and Jeffrey Zakem. Thus, the total incentive awards to the Class Representatives are reduced to $83,500.

VI. Objectors' Attorney's Fees

"[I]t is desirable to have as broad a range of participants in the class action fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally, and [] this participation is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee." Mirfasihi v. Fleet Mortg. Corp., 551 F.3d 682, 687 (7th Cir. 2008) (quoting Reynolds v. Beneficial National Bank, 288 F.3d 277, 288 (7th Cir. 2002)). "[O]bjectors have a valuable and important role to perform in policing class action settlements," In re Indep. Energy Holdings PLC Sec. Litig., 00 Civ. 6689 (SAS), 2003 WL 22801724, at *1 (S.D.N.Y. Nov. 24, 2003) (citing White v. Auerbach, 500 F.2d 822, 828 (2d Cir. 1974)), and therefore "are entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their efforts," White, 500 F.2d at 828. "In the absence of a showing that objectors substantially enhanced the benefits to the class under the settlement . . . they are not entitled to fees." Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1052 (9th Cir. 2002). "The trial judge has broad discretion in deciding whether, and in what amount, attorneys' fees should be awarded, since he is in the best position to determine whether the participation of objectors assisted the court and enhanced the recovery." White, 500 F.2d at 828.

The objectors in this case did little to aid this Court.[5]  While there were modifications to the notice program, these modifications were entirely on the Court's initiative and devised by the Special Master and the parties.  As for fees, the objections were so general and repetitive that they were of no assistance to an area with which this Court is intimately familiar.  See In re Excess Value Ins. Coverage Litig., 598 F. Supp. 2d 380, 393 (S.D.N.Y. 2005) ("Fundamentally, the Court needed little or no assistance from the Objectors in determining that Class Counsel's fee application should be . . . tailored to the actual benefit received by the Class."); In re Anchor Secs. Litig., No. 88 Civ. 3024 (CPS), 1991 WL 53651 (E.D.N.Y. Apr. 8, 1991) (denying fees to objectors' counsel because they "did not assist [the court] in framing the issues for the settlement . . . 'enhance' or 'improve' the recovery itself or its structure,' or 'affect[] the outcome as to fees"); compare Park v. Thomson Corp., 633 F. Supp. 2d 8, 11-12 (S.D.N.Y. 2009) (awarding objectors fees when they "helped transform the fairness hearing into a truly adversarial proceeding.").  Finally, the principal thrust by the Schrank and Bildstein objectors was to preserve the viability their separate tag-along state court actions.  As such, their objections were motivated entirely by self-interest and of no utility to the Class.

---

[5] Michael A. Fischer, Esq., an attorney for plaintiffs in an unrelated New York state court action, Fischer & Herbst v. Mastercard Int'l, Inc., Index No. 600572/2003, seeks attorney's fees. Fischer is neither an objector's counsel nor class counsel in this action.  The fees appear to be for reviewing the Court's docket, talking to Class Counsel and attending the fairness hearing for his clients.  There is simply no benefit to the class as a whole from this work and accordingly, the request for fees by Fischer is denied.  See In re Auction Houses Antitrust Litig., No. 00 Civ. 648 (LAK), 2001 WL 210697, at *4 (S.D.N.Y. Feb. 26, 2001) (denying fee requests for counsel who are neither Class Counsel or objectors).

Accordingly, the requests by various Objectors' counsel for fees are denied.[6]


CONCLUSION

In the final analysis, while not perfect, this Settlement with its revamped claims process and the participation of more than 10 million individual claimants embodies Jeremy Bentham's principle of utility to do "the greatest good for the greatest number of people." S.E.C. v. Bear Stearns & Co., 626 F. Supp. 2d 402, 419 (S.D.N.Y. 2009). Given the size and complexity of this multi-district litigation, it was prudent for this Court to have as much information as possible in assessing the fairness and adequacy of the Settlement. This was especially important in view of this Court's intervention to modify the notice and claims process. This Court is convinced that it was worth waiting and any delay was beneficial to the Class.

---

[6] At least one pro se objector, who is also an attorney, seeks attorney's fees. However, pro se objectors are not entitled to attorney's fees, even if they are an attorney. See In re Texaco Shareholder Derivative Litig., 123 F. Supp. 2d 169, 173 (S.D.N.Y. 2000), aff'd 28 Fed. App'x 83 (2d Cir. 2002); Pietroangelo v. U.S. Army, 568 F.3d 341 (2d Cir. 2009) (denying fees to pro se attorney); Zucker v. Westinghouse Elec. Corp., 374 F.3d 221, 228-29 (3d Cir. 2004) (holding that a shareholder-objector who represents himself as a pro se lawyer is not entitled to attorney's fees under the common fund doctrine).

For the foregoing reasons, in the exercise of its informed discretion, this Court grants final approval of the Settlement and grants in part and denies in part Class Counsel's motions for attorney's fees, reimbursement of expenses, and for incentive awards for the class representatives. The parties are directed to submit a final judgment forthwith.

Dated:   October 22, 2009
         New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Merrill G. Davidoff, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
*Co-Counsel for Plaintiffs*

Bonny E. Sweeny, Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101
*Co-Counsel for Plaintiffs*

Dennis Stewart, Esq.
Hulett Harper Stewart
550 West C Street, Suite 1700
San Diego, CA 92101
*Co-Counsel for Plaintiffs*

David F. Graham, Esq.
Sidley Austin LLP
10 South Dearborn Street
Chicago, IL 60603
*Attorneys for Defendants Citigroup, Inc., Citibank (South Dakota), N.A., Universal Bank, N.A., Universal Financial Corp., and Citicorp Diners Club, Inc.*

Christopher R. Lipsett, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
520 Madison Avenue
New York, NY 10022
*Attorneys for Defendants MBNA Corporation and MBNA America Bank, N.A.*

Jay N. Fastow, Esq.
Dickstein Shapiro LLP
1177 Avenue of the Americas
New York, NY 10036
*Attorneys for Defendant MasterCard International, Inc.*

Fiona A. Schaeffer, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Attorneys for Defendant MasterCard International Inc.*


Brian P. Brosnahan, Esq.
Kasowitz, Benson, Torres & Friedman LLP
101 California Street
Suite 2050
San Francisco, CA 94111
*Attorneys for Defendants Visa U.S.A., Inc. and Visa International Service Association*

Robert D. Wick, Esq.
Covington & Burling
1201 Pennsylvania Avenue, NW
Washington, DC 20004

Peter E. Greene, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
*Attorneys for Defendants J.P. Morgan Chase & Co., Chase Manhattan Bank, USA, N.A., and
The Chase Manhattan Bank Attorneys for Defendants Bank One Corp. and Bank One, Delaware,
N.A.*

Mark P. Ladner, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
*Attorneys for Defendants Bank of America Corp. and Bank of America N.A. (USA)*

George A. Cumming, Jr., Esq.
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
*Attorneys for Defendants Household International, Inc. and Household Bank (SB), N.A.*


Alan S. Kaplinsky, Esq.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
*Attorneys for Defendants Providian Financial Corp., Providian National Bank and Providian Bank*