UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN RE                                                  :

CURRENCY CONVERSION FEE                  :
ANTITRUST LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THIS DOCUMENT RELATES TO:               :

ROBERT ROSS and                                   :
RANDAL WACHSMUTH,
*on behalf of themselves and all others*      :
*similarly situated*,

                                                              :

                    Plaintiffs,

                                                              :

           - against -

                                                              :

AMERICAN EXPRESS COMPANY et al.,

                                                              :

                    Defendants.

                                                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MDL No. 1409
M 21-95



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/22/2010

04 Civ. 5723 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

        Robert Ross and Randal Wachsmuth ("Plaintiffs") bring this putative class action

asserting Sherman Act claims against Defendants American Express Company, American

Express Travel Related Services and American Express Centurion Bank (collectively,

"Defendants" or "American Express"). Plaintiffs' antitrust claims arise from alleged

conspiracies to fix foreign currency conversion fees and to impose arbitration clauses in

cardholder agreements.

        Presently before this Court are Plaintiffs' renewed motion for certification of a

damages class related to their foreign currency conversion fee price-fixing claim and

Defendants' motion to amend their answer to include the defense of release. For the following

reasons, Plaintiffs' motion is granted and Defendants' motion is denied.

## BACKGROUND[1]

### I. Procedural Background

Robert Ross and Randal Wachsmuth hold MasterCard or VISA (the "Networks")

credit cards.[2] Plaintiffs, the Networks and a number of banks that issue MasterCard- and VISA-

branded general purpose credit cards (the "MDL Defendant Banks") have been engaged in a

multi-district litigation before this Court styled In re Currency Conversion Fee Antitrust

Litigation, MDL No. 1409 (the "MDL Proceeding"). The MDL Proceeding involves claims

against the Networks and the MDL Defendant Banks (collectively, the "MDL Defendants").

Plaintiffs allege that the MDL Defendants conspired to fix foreign currency conversion fees

charged to cardholders. (Complaint dated July 22, 2004 ("Compl.") ¶ 1.) Drawing on the

conspiracy allegations in the MDL Proceeding, Plaintiffs initiated this action on July 22, 2004.

The Complaint alleges that against American Express "actively conspired" with the MDL

Defendants to fix currency conversion fees. (Compl. ¶¶ 1-3.) Although not at issue in this

---

[1] Familiarity with this Court's prior Memoranda and Orders in this action, the MDL Proceeding, and the opinions of the Court of Appeals is presumed. See In re Currency Conversion Fee Antitrust Litig., No. M 21-95, --- F.R.D. ----, 2009 WL 3415155 (S.D.N.Y. Oct. 22, 2009) ("CCF VIII"); Ross v. Am. Express Co., 547 F.3d 137 (2d Cir. 2008) ("Amex IV"); Ross v. Am. Express Co., 478 F.3d 96 (2d Cir. 2007) ("Amex III"); Ross v. Am. Express Co., No. 04 Civ. 5723, 2006 WL 2707393 (S.D.N.Y. Sept. 21, 2006) ("Amex II"); In re Currency Conversion Fee Antitrust Litig., No. M 21-95, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) ("CCF VII"); In re Currency Conversion Fee Antitrust Litig., No. M 21-95, 2005 WL 3304605 (S.D.N.Y. Dec. 7, 2005) ("CCF VI"); Ross v. Am. Express Co., No. 04 Civ. 5723, 2005 WL 2364969 (S.D.N.Y. Sept. 27, 2005) ("Amex I"); In re Currency Conversion Fee Antitrust Litig., No. M 21-95, 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005) ("CCF V"); In re Currency Conversion Fee Antitrust Litig., 229 F.R.D. 57 (S.D.N.Y. 2005) ("CCF IV"); In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237 (S.D.N.Y. 2005) ("CCF III"); In re Currency Conversion Fee Antitrust Litig., 224 F.R.D. 555 (S.D.N.Y. 2004) ("CCF II"); In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385 (S.D.N.Y. 2003) ("CCF I").

[2] There is no dispute that both Ross and Wachsmuth incurred foreign currency conversion fees on at least one of their credit cards issued by an MDL Defendant Bank during the class period and prior to the commencement of this lawsuit.

renewed class certification motion, Plaintiffs also assert that American Express "conspired with the MDL Defendant Banks to include compulsory arbitration clauses in their respective cardholder agreements." (Compl. ¶ 3.) This second claim concerning arbitration clauses is also the subject of another related action Ross v. Bank of America, 05 Civ. 7116 (WHP), against the MDL Defendant Banks and others, pending before this Court.

On September 27, 2005, this Court granted class certification on the arbitration clause conspiracy claim and also ruled that American Express could have the benefit of arbitration clauses in the cardholder agreements between the MDL Defendant Banks and the cardholders under the doctrine of equitable estoppel. Amex I, 2005 WL 2364969, at *11. However, this Court determined that Plaintiffs were entitled to a jury trial on the validity of the arbitration clauses before arbitration could be compelled. Concomitantly, this Court held that certification of a damages class for the foreign currency conversion fee claim was premature until the issue of arbitration was resolved. Amex I, 2005 WL 2364969, at *10. On September 21, 2006, this Court denied American Express's motion for reconsideration. Amex II, 2006 WL 2707393.

American Express appealed this Court's decisions regarding arbitration and class certification. Plaintiffs cross-appealed this Court's application of the doctrine of equitable estoppel. The Court of Appeals denied American Express's petition regarding the class certification ruling, but agreed to hear the appeals regarding arbitration. On October 21, 2008, the Court of Appeals reversed this Court's memorandum and order in part and concluded that American Express could not enjoy the benefit of the arbitration clauses under the doctrine of equitable estoppel. Amex IV, 547 F.3d at 148.

3

The MDL Defendants entered into a Settlement Agreement with Class Counsel on July 20, 2006 (the "Settlement"). The Settlement provides for the payment of $336 million in full settlement of the claims in the MDL Proceeding. This Court granted preliminary approval on November 20, 2006. See CCF VII, 2006 WL 3247396. After the notice program was re-engineered at the Court's direction, more than 10 million claims with a face value of between $557 to $577 million were filed. CCF VIII, 2009 WL 3415155, at *7. On October 22, 2009, this Court granted final approval. See CCF VIII, 2009 WL 3415155.

## II. Plaintiffs' Factual Allegations

VISA, MasterCard and American Express are the three largest general purpose credit card networks. (Compl. ¶ 18.) In 2003, over 90% of all purchases with general purpose credit cards were made with VISA, MasterCard or American Express cards. (Compl. ¶ 18.) At the time this lawsuit was filed, the Networks and American Express operated differently. VISA and MasterCard were associations "created, owned, governed, and operated by and in the interests of their member banks." (Compl. ¶ 22.) VISA- and MasterCard-branded cards are issued to cardholders through member banks. (Compl. ¶ 18.) In contrast, American Express was a closed network that issued cards directly to cardholders. (Compl. ¶ 19.)

VISA, MasterCard and American Express each allow United States cardholders to enter into transactions in foreign currencies. (Compl. ¶¶ 28, 48.) In return, the Networks and American Express assess a fee for their service. VISA and MasterCard cardholders pay a two-tiered foreign currency conversion fee. (Compl. ¶ 31.) The first tier constitutes 1% of the foreign transaction amount charged by cardholders and is retained by the Networks. (Compl. ¶¶ 2, 31.) The second tier typically equals 2% of the transaction amount and is retained by the

4

MDL Defendant Banks. (Compl. ¶ 31.) American Express, in contrast, assesses a single fee for its currency conversion service that equals 2% of the transaction amount. (Compl. ¶¶ 19, 48.)

American Express and the MDL Defendant Banks disclosed their respective conversion fees in cardholder agreements, change-in-terms notices and initial disclosure statements. (Compl. ¶ 44.) Plaintiffs allege, however, that because those fees were not disclosed in application solicitations or in the cardholders' monthly billing statements, the MDL Defendants, Diners Club, and American Express concealed both the existence and amount of the conversion fees imposed. (Compl. ¶¶ 41-42.) In particular, Plaintiffs contend that it is impossible to extrapolate the conversion fee for a given transaction based on the information provided in monthly billing statements. (Compl. ¶¶ 42-43.)

Plaintiffs also allege that after American Express raised its conversion fee to 2%, it co-sponsored a meeting on May 25, 1999 attended by certain MDL Defendant Banks, including Citigroup and Chase. (Compl. ¶¶ 49-50.) According to Plaintiffs, at that meeting the MDL Defendant Bank attendees learned that American Express did not disclose conversion fees in billing statements. In addition, the MDL Defendant Banks confirmed their plans to impose fees. (Declaration of David Langer dated Apr. 24, 2009 ("Langer Decl.") Ex. 16: Plaintiffs' Responses and Objections to Defendants' Second Set of Interrogatories dated Oct. 14, 2005 ("Oct. 2005 Resp.") at 10-11.) Plaintiffs further contend that the MDL Defendant Bank attendees discussed the possibility of assessing a 2% fee. (Compl. ¶ 51; Oct. 2005 Resp. at 11.) Plaintiffs claim that American Express was uncertain that its competitors charged a currency conversion fee and was concerned that it would be harmed if it acted alone. (Oct. 2005 Resp. at 10-11.) Following the meeting, Plaintiffs contend that the MDL Defendant Banks and American Express implemented a uniform 2% conversion fee. (Compl. ¶ 52; Oct. 2005 Resp. at 11-12.)

5

Based on these allegations, Plaintiffs assert that "[t]he MDL Defendant Banks, together with American Express, conspired to fix and maintain the amount of the second tier fee at an agreed-upon level, and . . . to restrain competition by concealing the fee." (Compl. ¶ 39.)

## III. Plaintiffs' Expert Evidence

Plaintiffs offer an expert report from Dr. Gustavo E. Bamberger to establish that common questions predominate over individual ones in this action.[3] Plaintiffs also draw on expert reports from Defendants' expert reports from Dr. Robert E. Litan and Dr. Frederic M. Scherer to buttress their contention.

First, Dr. Bamberger contends that a determination of the relevant market should be made on a class-wide basis. After the market is defined, the question of whether American Express and the MDL Defendants possess market power within that market must be considered using evidence common to all members of the class. (Langer Decl. Ex. 4: Declaration of Gustavo E. Bamberger dated Feb. 18, 2005 ("Bamberger Decl.") ¶ 22-23; Langer Decl. Ex. 6: Expert Report of Gustavo Bamberger dated Sept. 12, 2005 ("Bamberger Report") ¶¶ 21-22.) Dr. Bamberger explains that determination of the relevant market requires evaluation of substitute products available to cardholders in the event of a hypothetical price increase imposed by all firms in the proposed relevant market. (Bamberger Decl. ¶¶ 22-23.) He also explains that a firm or group of firms has market power when they have the ability to raise the price above the competitive level. (Bamberger Decl. ¶ 25.) Based on these definitions, Dr. Bamberger concludes that because individual cardholders do not independently negotiate foreign currency transaction fees, all cardholders would face the same increase, which would allow the fact finder

---

[3] Plaintiffs have also offered the reports of Dr. Bradley N. Reiff, and Mike McCormack in support of this renewed motion for class certification.

6

to determine the relevant market and market power. (Bamberger Decl. ¶¶ 24, 26.) Thus, both determinations would be subject to common class-wide proof. (Bamberger Decl. ¶¶ 24, 26.)

Bamberger also maintains that the conspiracy had a common impact on the class—payment of a conspiratorially-set fee for the use of a general-purpose card issued by an MDL Defendant Bank to purchase goods or services denominated in foreign currencies. (Bamberger Decl. ¶¶ 27-28.) In addition, determining the size of this common impact would rely on evidence common to all class members—the difference between the amount of the fee actually paid and the amount the class members would have paid absent the conspiracy. (Bamberger Decl. ¶ 28.) Thus, Bamberger opines that common proof may be used because the fees are set for groups of cardholders, and are not the product of individual cardholder-by-cardholder negotiations. (Bamberger Decl. ¶ 28.)

Finally, Bamberger asserts that aggregate and individual damages could be calculated on a class-wide basis. (Bamberger Decl. ¶¶ 29-33.) Specifically, individual damages can be measured by applying the same formula to each class member, even though each individual class member may not have been equally damaged. (Bamberger Decl. ¶ 30.) Under Bamberger's model, damages can be determined by finding the difference between what the MDL Defendant Banks would have charged for a currency conversion fee in the absence of the alleged conspiracy and what they did charge. (Bamberger Decl. ¶¶ 31-32.) Bamberger opines that in the absence of the alleged conspiracy, the MDL Defendant Banks would have been unable to impose the currency conversion fee. (Bamberger Decl. ¶ 31.) Thus, the aggregate and individual damages equal the entire amount of the currency conversion fee charged by the MDL Defendant Banks. (Bamberger Decl. ¶¶ 32-33.) In addition, the individual damages can be determined formulaically because the damages for each member of the Damages Class equals

7

the actual issuer fees paid by a class member minus the "but-for" fee times the dollar value of the transactions to which the fee was applied. (Bamberger Decl. ¶ 33.) Under Dr. Bamberger's model, the "but-for" fee is zero and so each class member's damages would equal the additional fees actually paid by that class member. (Bamberger Decl. ¶ 33.)

Plaintiffs also proffer Defendants' expert reports from Drs. Litan and Scherer to demonstrate that common question predominate in this action. Dr. Litan provides three conclusions. First, that Bamberger's damages analysis is incorrect because the "but for" fee would not be zero as Dr. Bamberger opines, but rather would approximate the amount actually imposed. (Langer Decl. Ex. 13: Defendants' Expert Report of Robert E. Litan dated Oct. 14, 2005 ("Litan Report") ¶¶ 12, 15-27.) Second, that Bamberger's conclusion regarding market power was incorrect because it misapprehends the structure of the market and how the market prices services, such as currency conversion. (Litan Report ¶¶ 13, 28-33.) Finally, that Bamberger's analysis of outside counsel's communications at meetings between MDL Defendant Banks' in-house counsel and American Express's in-house counsel is incorrect and that these communications are not evidence of collusive activity. (Litan Report ¶¶ 34-52.)

Defendants' other expert, Dr. Scherer, opines on the structure and dynamics of the general purpose credit card market. He concludes that the behavior exhibited by the MDL Defendants in pricing foreign currency conversion fees and the meetings held between in-house counsel are not indicative of collusion, but rather of rational non-collusive economic behavior. (Langer Decl. Ex. 14: Defendants' Expert Report of Frederic M. Scherer dated Oct. 15, 2005.)

IV. LiPuma Release

On August 23, 2003, Edward LiPuma filed a putative class-action complaint on behalf of American Express cardholders against American Express in Florida state court,

alleging violations of the Florida Deceptive and Unfair Trade Practices Act and unjust enrichment for claims arising out of American Express's foreign currency conversion practices, including the assessment and disclosure of the 1 to 2% foreign currency conversion fee (the "LiPuma Action"). LiPuma v. Am. Express Co., 406 F. Supp. 2d 1298, 1300 (S.D. Fla. 2006); see also (Declaration of Charles P. Goodwin dated May 21, 2009 ("Goodwin Decl.") Ex. 7: Complaint, LiPuma v. American Express Co., No. 03-19365 (Fla. Cir. Ct., 11th Jud. Cir.) ("Original LiPuma Complaint") ¶ 2). On February 10, 2004, following some discovery and a lengthy mediation, the parties reached a settlement. As part of the settlement, LiPuma filed a First Amended Complaint adding a Truth in Lending Act claim. (Goodwin Decl. Ex. 10: First Amended Complaint dated Feb. 10, 2004 ("LiPuma Amended Complaint").) In addition to the currency conversion fee allegations, the LiPuma Amended Complaint included allegations concerning American Express's methodology for setting conversion rates.

The LiPuma settlement agreement, signed on June 9, 2004, (the "LiPuma Settlement Agreement") provides for the following releases (the "LiPuma Release"):

> Upon the Effective Date, . . . the Representative Plaintiffs and each of the Settlement Class Members, and their respective heirs, executors, administrators, representatives, agents, attorneys, partners, spouses, successors, predecessors-in-interest, assigns, and any authorized users of their accounts, shall be deemed to have, and by operation of the Judgment shall have, fully, finally and forever released, relinquished and discharged any and all rights, duties, obligations, claims (including those that the Representative Plaintiffs or any Settlement Class Member does not know or suspect to exist in his, her, or its favor at the time of the release which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this settlement), actions, causes of action or liabilities, whether arising under local, state, or federal law, whether by statute, contract, common law or equity whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, as of the Effective Date:

> (1) that arise out of or are related in any way to any or all of the acts, omissions, facts, matters, transactions, or occurrences that were directly or indirectly alleged, asserted, described, set forth or referred to in the Litigation including, but not limited to, claims for alleged violations of the Truth in Lending Act (including the Fair Credit Billing Act), state consumer credit or consumer protection statutes, common law prohibiting unfair or deceptive trade practices, breach of contract, fraud, and/or misrepresentation and equity prohibiting unjust enrichment or requiring restitution or disgorgement; and (2) that are, were, or could have arisen out of or been related in any way to Defendants' foreign currency conversion practices and the disclosures relating thereto. The release includes all claims premised on any state, federal or common law cause of action arising out of American Express's currency conversion practices. However, the release does not release the claims of non-American Express cardholders or of American Express cardholders against Visa, MasterCard, or any issuer other than American Express. . . .

(Goodwin Decl. Ex. 3: Settlement Agreement dated June 9, 2004 § 4.1.)

With the addition of the federal claim, American Express promptly removed the LiPuma Action to federal court in the Southern District of Florida. LiPuma, 406 F. Supp. 2d at 1307; (LiPuma Amended Complaint). Neither complaint in the LiPuma Action mentions Visa, MasterCard or any of the other MDL Defendants. The parties then moved for preliminary approval of their settlement. The federal court in Florida preliminarily approved the settlement on October 15, 2004, and certified the following class:

> All former or current American Express cardmembers or account holders with U.S. billing addresses who incurred a charge denominated in a foreign currency, and paid that charge in U.S. dollars, during the time period between March 28, 1997 and October 15, 2004, and who did not negotiate (or on whose behalf there was not negotiated) a foreign currency conversion methodology for their American Express account(s).

LiPuma, 406 F. Supp. 2d at 1308.

The LiPuma court held a final Fairness Hearing on March 14 and 15, 2005.

LiPuma, 406 F. Supp. 2d at 1309. At that hearing several objectors raised concerns about the

breadth of the release. LiPuma, 406 F. Supp. 2d at 1310. Specifically, these objectors claimed that the release improperly included allegations related to American Express's selection of the foreign currency conversion rate used on foreign currency transactions. LiPuma, 406 F. Supp. 2d at 1310-11. These objectors complained that class counsel in the LiPuma Action had negotiated away these valuable claims without any effort to assess their value.

On December 20, 2005, the LiPuma court approved the settlement, finding that it was fair, adequate and reasonable. As for objections to the scope of the release, the LiPuma court noted that "to the extent that additional released claims are transactionally related to the underlying conduct and are merely alternative causes of action that could have been brought against the challenged conduct, the defendants' demands for finality and closure appear appropriate and have given courts little pause." LiPuma, 406 F. Supp. 2d at 1317 (internal quotation marks and citation omitted). The LiPuma court framed the issue of the propriety of the release as "whether the 1-2% surcharge that American Express added to all foreign currency conversion exchanges is transactionally related to its addition of a competitive rate adjustment. . . ." LiPuma, 406 F. Supp. 2d at 1317.

The LiPuma court dismissed the objectors' concerns, finding that "it was not unreasonable for American Express to have requested that the pleading be amended to add express language that would resolve any future claims concerning the 'spread claim' since the two formed part of one continuous process of foreign currency conversion." LiPuma, 406 F. Supp. 2d at 1317. The LiPuma court distinguished the LiPuma Release from class action settlements that were rejected by noting that those cases "present instances where the settlements included the release of claims that were not related to the claims litigated," and finding that "[h]ere, the 'claimants' are one and the same . . . [a]ny party aggrieved by American Express'

application of a rate adjustment and failure to disclose the adjustment in the monthly statements would also be aggrieved by American Express selecting the most favorable rate but not passing that along to the cardmember, or revealing it." LiPuma, 406 F. Supp. 2d at 1317-18. The LiPuma court concluded that the rate selection claims were properly included because "[t]he harms are transactionally related, and moreover, were explained and included in the Amended Complaint and in the notice to the Class." LiPuma, 406 F. Supp. 2d at 1318. The LiPuma court further found that "[g]iven the [LiPuma court's] conclusion that the rate selection and spread claims are transactionally related, the failure of the Class notice to reveal the settlement would be disposing of other claims . . . does not render it defective." LiPuma, 406 F. Supp. 2d at 1318 n.12.

On January 30, 2006, the LiPuma court issued a Final Judgment and Order of Dismissal with Prejudice. (Goodwin Decl. Ex. 5: Final Judgment and Order of Dismissal with Prejudice dated Jan. 30, 2006 ("Final Judgment").) The Final Judgment referred to the LiPuma court's final approval order and the LiPuma Release. (Final Judgment ¶ 8.)

## DISCUSSION

I. Proposed Class Definition

Plaintiffs seek certification of the following class:

> All VISA, MasterCard and Diners Club general purpose cardholders who used cards issued by any of the Co-Conspiring Banks during the Damages Period from July 22, 2000 to November 8, 2006, and were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services priced in foreign currencies or in foreign countries and who have submitted valid claims, regardless of timeliness in the settlement of In re Currency Conversion Fee Antitrust Litigation, No. 01-MD-1409 (WHP), Master File No. 21-95 (S.D.N.Y.).

This proposed class is narrower than the class definition in the Complaint, which sought to include all MDL Defendant Bank cardholders who incurred the currency conversion fee without regard to whether they filed a claim in the MDL Proceeding. The Defendants do not object to narrowing the proposed class definition. Moreover, this definition leverages the millions of dollars spent in the MDL Proceeding to identify claimants and makes this action more manageable. This Court sees no prejudice and grants Plaintiffs leave to amend their Complaint to seek certification of this narrower class. See In re N.Y. City Mun. Sec. Litig., 87 F.R.D. 572, 580-81 (S.D.N.Y. 1980) ("Prior to a decision on the merits, leave to amend the complaint to redefine the class should be freely given except when some prejudice results to either the defendants or to those persons dropped from the class."). Accordingly, this Court will now consider the question of certification of this narrower class.

## II. Class Certification

### A. Legal Standard

To certify a class pursuant to Rule $23(b)(3)^4$, a plaintiff must satisfy the numerosity, commonality, typicality and adequacy of representation requirements of Rule 23(a) and meet the additional requirements of predominance and superiority. Fed. R. Civ. P. 23(a) & (b)(3); McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 222 (2d Cir. 2008); In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 32 (2d Cir. 2006) ("In re IPO"). The Court of Appeals has disavowed language permitting courts to certify a class based on "some showing" of compliance with the Rule 23 requirements and so long as the plaintiff's expert report was "not fatally flawed," and has set a higher standard. See Hnot v. Willis Group Holdings Ltd., 241 F.R.D. 204, 207-09 (S.D.N.Y. 2007) (explaining the changes in the law made by In re IPO).

---

[4] Plaintiffs seek certification of a class pursuant only to Rule 23(b)(3).

Under this new standard, a district court must undertake a "rigorous analysis" to determine whether each of the Rule 23 requirements has been met. See In re IPO, 471 F.3d at 33, 41 (quoting Gen. Tel. Co. of SW. v. Falcon, 457 U.S. 147, 161 (1982)). Specifically, In re IPO requires that: (1) a district court must receive evidence in the form of affidavits, documents, or testimony sufficient to make a determination that each of the Rule 23 requirements has been met; (2) in making such determination, the court must resolve factual disputes relevant to each Rule 23 requirement and find whether the underlying facts relevant to a particular Rule 23 requirement have been established; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even one identical to a Rule 23 requirement; and (4) in making such determinations, a district court should not assess any aspect of the merits unrelated to a Rule 23 requirement. See In re IPO, 471 F.3d at 41. Moreover, while the plaintiff must meet the requirements of Rule 23 by a preponderance of the evidence, see In re Flag Telecom Holdings Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008)), "any such Rule 23 fact-finding is not binding on the trier of facts at the merits stage, even if the trier of fact is the class certification judge," McBean v. City of N.Y., 260 F.R.D. 120, 131 (S.D.N.Y. 2009).

### B. Rule 23(a) Requirements

#### 1. Numerosity, Commonality, and Typicality

With over 10 million filed claims in the MDL Proceeding, there is no dispute that numerosity—a class so large that joinder of all members is impractical—is met. See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity is presumed when there are more than 40 class members). Also, Defendants do not dispute that there are

common questions of law and fact at least relating to the existence of a conspiracy, its scope, and its efficacy. See In re NASDAQ Market Makers Antitrust Litig., 169 F.R.D. 493, 509 (S.D.N.Y. 1996) (finding "allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)" (collecting cases)); see also In re Foundry Resins Antitrust Litig., 242 F.R.D. 393, 405 (S.D. Ohio 2007) (finding plaintiffs "have a shared interest in attempting to prove that Defendants engaged in a conspiracy to fix, raise, and maintain the prices").

"To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" In re Flag Telecom, 574 F.3d at 35 (quoting Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)). "Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 304 (E.D. Mich. 2001). In this case, the named Plaintiffs' claims are typical because Plaintiffs must prove a conspiracy, its effectuation, and damages therefrom—precisely what the absent class members must prove to recover. See In re Static Random Access Memory (SRAM) Antitrust Litig., No. C 07-01819 (CW), --- F.R.D. ----, 2009 WL 4263524, at *5 (N.D. Cal. Nov. 25, 2009) (finding overarching price fixing scheme satisfied typicality); In re Ready Mix Concrete Antitrust Litig., 261 F.R.D. 154, 168 (S.D. Ind. 2009) ("Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violation as the defendants."); In re Urethane Antitrust Litig., Polyether Polyol Cases, 251 F.R.D. 629, 640-41 (D. Kan. 2008) ("Urethane II") (finding typicality in an antitrust price-fixing conspiracy (collecting cases)); see also In re Potash Antitrust Litig., 159 F.R.D. 682, 691 n.11 (D. Minn. 1995) (same) (collecting cases).

## 2. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct this litigation.'" In re Flag Telecom, 574 F.3d at 35 (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)). "The focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.'" In re Flag Telecom, 574 F.3d at 35 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)). However, "[i]n order to defeat a motion for certification, the conflict must be fundamental." In re Flag Telecom, 574 F.3d at 35 (internal quotation marks and citation omitted).

Relying in part on a footnote in this Court's decision in Amex I, Defendants contend that Ross and Wachsmuth are adequate class representatives only for cardholders holding the same cards that Plaintiffs actually hold and on which Plaintiffs incurred currency conversion fees at the time the litigation was filed. In Amex I, this Court noted that Ross and Wachsmuth were adequate representatives only for the cards they actually held. See Amex I, 2005 WL 2364969, at *1 n.1. This holding was based in part on this Court's prior holding in CCF IV that the named plaintiffs in that action, Chase and Citibank cardholders, were inadequate to represent cardholders of another bank, Providian, because the plaintiffs there only offered "conclusory statements" that they would adequately protect the interests of the absent class members. See CCF IV, 229 F.R.D. at 64-65.

This Court is mindful that the law of the case doctrine instructs "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages

16

in the same case" unless "cogent and compelling reasons militate otherwise." United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotation marks omitted). However, the law of the case doctrine is tempered because it "'does not rigidly bind a court to its former decisions, but is only addressed to its good sense,'" Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (quoting Higgins v. Cal. Prune & Apricot Grower, Inc., 3 F.2d 896, 898 (2d Cir. 1924) (L. Hand, J.)).

Here, a confluence of circumstances warrants re-visiting the adequacy of Ross and Wachsmuth to represent a broader class. First, to the extent this Court's prior ruling was premised on concerns regarding arbitration—an issue that has permeated this action and the MDL Proceeding, those concerns were obviated by the Court of Appeals decision in Amex IV. See Amex IV, 547 F.3d at 148. Second, in contrast to the record that was before this Court when it ruled in CCF IV and Amex I, Plaintiffs have submitted extensive additional factual evidence demonstrating that they have and can continue to adequately and zealously protect the interests of the entire proposed class regardless of issuing bank. See Capitol Records, Inc. v. MP3Tunes, LLC, No. 07 Civ. 9931 (WHP), 2009 WL 3364036, at *5-6 (S.D.N.Y. Oct. 16, 2009) (departing from the law of the case based on new evidence); see also Boucher v. Syracuse Univ., 164 F.3d 113, 118 (2d Cir. 1999) ("District judges have broad discretion over class definition[,] . . . courts are required to reassess their class rulings as the case develops." (internal quotation marks omitted)).

Moreover, a facet of Plaintiffs' economic evidence is that the alleged conspiracy possessed market power. While not an element of a price-fixing conspiracy claim, it could enable Plaintiffs to show that price fixing was feasible in this market. See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 655 (7th Cir. 2002) (noting that economic evidence

17

that the market structure made price fixing feasible or that the market overall behaved in a noncompetitive manner is important in cases where the noneconomic evidence of collusion is "suggestive rather than conclusive"). This creates a strong incentive for Plaintiffs to prove participation by all (or by as many as possible) of the MDL Defendant Banks in the alleged conspiracy. And the evidence Plaintiffs submit shows that they are endeavoring to do so.

Finally, the great weight of authority in price-fixing conspiracy cases, absent special circumstances such as arbitration, holds that the victim of one alleged co-conspirator is adequate to prove liability for victims of all co-conspirators. See In re Vitamins Antitrust Litig., 209 F.R.D. 251, 262 (D.D.C. 2002) ("[B]ecause the plaintiffs have alleged an overarching single conspiracy . . . all named plaintiffs will have the same incentive to the case as an absentee class member. This incentive is in no way diminished by the fact that . . . the named representatives may have used different methods of purchase."); see also Urethane II, 251 F.R.D. at 644 (named plaintiffs had the "same interests as the other class members in proving they were all damaged by defendants alleged price-fixing conspiracy"); In re Tableware Antitrust Litig., 241 F.R.D. 644, 649 (N.D. Cal. 2007) (adequacy was met where "[m]embers of the class were allegedly overcharged for tableware and [had] a mutual and coterminous interest in establishing defendants' liability and in recovering damages" in common with representative plaintiffs); In re Carbon Black Antitrust Litig., No. 03 MDL 1543 (DPW), 2005 WL 102966, at *14 (D. Mass. Jan. 18, 2005) ("The overarching question here is the conduct of the defendants, not the specific damage calculation or relevant bargaining power among the plaintiffs. Therefore, the named plaintiffs and their counsel have the same core objectives as would absent class members."); In re Linerboard Antitrust Litig., 203 F.R.D. 197, 208 (E.D. Pa. 2001) (same); NASDAQ Market-Makers, 169 F.R.D. at 519 (Because antitrust law "provides for joint and several liability of co-

conspirators, each Plaintiff will have an equal incentive to generally prove the Defendants' participation in the alleged conspiracy."); In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 243 (E.D.N.Y. 1998) ("the fact that Plaintiffs purchased only a small portion of the products whose prices were anti-competitively established, and from only certain retailers and not all co-conspirator retailers, does not render the Plaintiffs inadequate representatives of the Class as a whole"); In re Industrial Diamonds Antitrust Litig., 167 F.R.D. 374, 381 (S.D.N.Y. 1996) ("Where the plaintiffs have alleged a single conspiracy to artificially inflate prices, a representative plaintiff may satisfy the adequacy requirement without having purchased products from all of the defendants. . . . The crucial inquiry is not how many of defendants' products each plaintiff purchased, but rather whether each plaintiff has sufficient incentive to present evidence that will establish the existence of the alleged conspiracy and its effect on the prices of the products purchased by the putative class members.").

Defendants assert no other disabling conflict between the named Plaintiffs and the other members of the class and this Court discerns none. Because Ross and Wachsmuth allege a unitary, overarching price-fixing conspiracy, this Court finds that even though they did not hold cards from all co-conspirators, they are adequate class representatives for the entire proposed class. Plaintiffs have every incentive to expose the full scope of the conspiracy and have shown that they will zealously pursue the interests of the entire class. As for the second prong, Defendants do not dispute the quality of class counsel—they are experienced antitrust lawyers who have demonstrated they are willing and able to vigorously pursue this case. Accordingly, this Court finds that Plaintiffs satisfy the adequacy requirement of Rule 23(a)(4) for the entire class of VISA, MasterCard, and Diner's Club cardholders that they seek to represent.

## C. Rule 23(b)(3) Requirements

### 1. Predominance of Common Questions

To meet Rule 23(b)(3)'s predominance requirement, Plaintiffs must demonstrate that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3). In other words, "[t]he predominance requirement is met if the plaintiff can 'establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 107-08 (2d Cir. 2007) (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 135 (2d Cir. 2001)) (alterations in the original). At the outset this Court notes that this is "a test readily met in certain cases alleging . . . violations of the antitrust laws." Amchem, 521 U.S. at 625. "But it does not follow that a court should relax its certification analysis or presume a requirement for certification is met merely because plaintiff's claims [are antitrust claims]." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 321-22 (3d Cir. 2008).

Section 1 of the Sherman Act provides in relevant part that "[e]very . . . conspiracy, in restraint of trade or commerce . . . is hereby declared to be illegal." 15 U.S.C. § 1. "The three required elements of an antitrust claim are (1) a violation of antitrust law; (2) injury and causation; and (3) damages." Cordes, 502 F.3d at 105 (internal alterations omitted). "The injury and causation element has also been referred to as 'antitrust injury' and 'causation or impact.'" In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 256 F.R.D. 82, 87 (D. Conn. 2009).

a. Violation of the Antitrust Laws

"Horizontal price-fixing agreements are per se violations of the Sherman Act." Cordes, 502 F.3d at 105 (citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218-28 (1940)). Thus, if proven, Plaintiffs' allegations of a horizontal price-fixing conspiracy would be sufficient to show an antitrust violation. Moreover, Plaintiffs have shown that common questions predominate on this first element because: (1) the foreign currency conversion fees were not negotiated on an individual basis, and (2) the evidence of a conspiracy consists of class-wide economic proof, parallel conduct, and meetings among the competitors. See Cordes, 502 F.3d at 105 (finding price-fixing conspiracy is susceptible to common proof and meets the first element); see also EPDM, 256 F.R.D. at 87; In re Auction Houses Antitrust Litig., 193 F.R.D. 163, 165-66 (S.D.N.Y. 2000).

b. Antitrust Injury

As for the second element, "[i]n general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury. . . ." State of N.Y. v. Hendrickson Bros., Inc., 840 F.2d 1065, 1079 (2d Cir. 1988). However, "[a]ntitrust defendants are free to argue . . . that their cases are exceptional because too many variables enter into setting prices in their industries to permit common proof of impact." Industrial Diamonds, 167 F.R.D. at 382. There are two prongs that must be satisfied to meet the antitrust injury element. "One prong is the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-fact.' The other is the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Cordes, 502 F.3d at 106 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

### i. Legal Prong

Defendants argue that because the MDL Defendant Banks imposed their foreign currency conversion fees at different times, the antitrust injury element is not susceptible to class-wide proof. Defendants contend that the reason this is "problematic" because some class members suffered harm during the class period while others were not affected at all. However, "[Section] 1 of the Sherman Antitrust Act does not outlaw only perfect conspiracies to restrain trade." United States v. Beaver, 515 F.3d 730, 739 (7th Cir. 2008). Moreover, "[i]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period." Masters v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911 (HB), 2003 WL 145556, at *5 (S.D.N.Y. Jan. 17, 2003); see also Interstate Circuit, Inc. v. United States, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); United States v. Rea, 958 F.2d 1206, 1214 (2d Cir. 1992) ("A defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member."). Thus, when a particular MDL Defendant Bank imposed its currency conversion fee is irrelevant to the issue of common proof.

Plaintiffs' allegations that they paid supracompetitive prices for foreign currency conversion fees as a result of the alleged conspiracy can be proved by evidence common to the class and would be sufficient to meet the legal prong of antitrust injury. In addition, Defendants point to no individualized factors in the industry. Thus, these questions are common to the class. See Cordes, 502 F.3d at 107; EPDM, 256 F.R.D. at 88 (finding predominance for legal prong of

antitrust injury met in an antitrust price fixing conspiracy by persons who paid supracompetitive prices).

## ii. Factual Prong

The so-called "factual prong" of the antitrust injury element "requires that harm actually resulted from the antitrust violation—the 'injury-in-fact'. . . ." EPDM, 256 F.R.D. at 88. "To meet the predominance requirement for class certification, the plaintiffs must show that injury-in-fact, or impact, can be proven by evidence common to the class." EPDM, 256 F.R.D. at 88. "It is important to note at the outset that 'impact' (or 'injury-in-fact') and 'damages' are two distinct elements of an antitrust claim—injury-in-fact is whether the plaintiffs were harmed and damages quantify by how much." EPDM, 256 F.R.D. at 88 (citing Cordes, 502 F.3d at 107 n.11); see also Urethane II, 251 F.R.D. at 638 ("'The issue in the common impact analysis is the fact, not the amount of the injury.'" (quoting Potash, 159 F.R.D. at 695)).

In this case, both sides offer experts who agree on a methodology of determining class-wide impact: comparing actual prices to those that would exist in a "but for" environment—that is, without the allegedly unlawful activity. (Compare Litan Report ¶¶ 15, 27 with Bamberger Decl. ¶¶ 27, 28.) The two experts disagree as to what that impact is. In the model constructed by Plaintiffs' expert, the "but for" price of foreign currency conversion fees would be zero, and so the damages and impact of the conspiracy are the entire amount of the fee—2%. In contrast, Defendants' expert contends that banks would have imposed the same fee even in the absence of collusion based on the overall structure of the credit card market. In Litan's model, the "but for" price is equal to the actual price, so the class-wide damages are zero.

Under the more demanding standard of In re IPO, when both experts rely on evidence common to the class, this Court should not resolve which "but for" price is correct. See

EPDM, 256 F.R.D. at 90 ("When assessing the predominance requirement of Rule 23(b)(3), . . . [the Court] need only determine whether the element of injury-in-fact can be proven by evidence common to the class"); see also Urethane II, 251 F.R.D. at 636 (the appropriate inquiry at class certification is not whether the plaintiffs have proven on the merits that they paid an artificially high price due to the defendants' alleged price-fixing conspiracy, but rather, "'whether class-wide impact may be proven by evidence common to all class members.'" (quoting In re Bulk (Extruded) Graphite Prods. Antitrust Litig., No. 02 Civ. 6030 (WHW), 2006 WL 891362, at *2 (D.N.J. Apr. 4, 2006)). Thus, for this inquiry—whether common questions predominate to prove injury-in-fact—it is sufficient that a common formula exists.

Defendants' argument that the MDL Defendant Banks' imposition of currency conversion fees at different times bars proof of antitrust injury by common evidence fares no better on this second prong than it did on the first. The question of "when" the fees were imposed was irrelevant to Defendants' experts' ability (or Plaintiffs' experts' ability for that matter) to construct a common model and determine injury-in-fact by a common means. Accordingly, because the parties essentially agree on a common methodology for proving injury-in-fact on a class-wide basis, common questions also predominate on the injury-in-fact prong of antitrust injury.

## c. Damages

The final element of an antitrust claim is damages. See Cordes, 502 F.3d at 105. "[P]laintiff's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969). Indeed, "[t]he antitrust cases are legion

24

which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 534 (6th Cir. 2008) (quotation marks omitted); see also Texaco, Inc. v. Hasbrouck, 496 U.S. 543, 572-73 (1990). "[T]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification . . . [but] it is nonetheless a factor [to be] consider[ed] in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." McLaughlin, 522 F.3d at 231; see also EPDM, 256 F.R.D. at 96; Industrial Diamonds, 167 F.R.D. at 382 ("Courts have routinely held, however, that the need for individualized determinations of the putative class members' damages do not, without more, preclude certification of a class under Rule 23(b)(3).").

Here, Plaintiffs have shown that the existence of damages sufficient to establish the final element of an antitrust claim is susceptible to class-wide proof. See Zenith Radio, 395 U.S. at 114 n.9. Based on Plaintiffs' proposed methodology for determining the difference between the "but for" fee and the actual fee, it should be possible to calculate the amount of the fee paid by each member for each transaction that was an overcharge on a class-wide basis. See Scrap Metal, 527 F.3d at 535 (noting "the court found that the 'fact of damages' was a common question even if the amount of damages sustained by each individual class member varied"); Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004) ("Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification."); see also Yokoyama v. Midland Nat'l Life Ins. Co., No. 07-16825, --- F.3d ----, 2009 WL 2634770, at *6 (9th Cir. Aug. 28, 2009) (noting that the need for individual "damage calculations alone cannot defeat certification").

Indeed, Defendants offer no argument that there are individual issues about how any overcharge should be calculated—rather, they argue only that there are class members who have either been fully compensated by the MDL Settlement or have released their claims under the LiPuma Settlement.[5] This is insufficient to deny class certification at this point. See, e.g., In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 86 (E.D.N.Y. 2000) ("However, the presence of individualized defenses, such as mitigation, going only to damages are generally regarded as no barrier to class certification."); Krueger v. N.Y. Tel. Co., 163 F.R.D. 433, 440-41 (S.D.N.Y. 1995) ("To the extent that there may be specific defenses against specific members of the class, they would not justify denying class action certification."); see also Scrap Metal, 527 F.3d at 535-36 (noting "even where there are individual variations in damages the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure"). To the extent these potential defenses could present some individual issues, there are many ways in which this Court can deal with those issues when they arise. See Visa Check, 280 F.3d at 141 (listing possible "management tools" available to a district court to address individualized damages issues).

Accordingly, this Court finds that common issues will strongly predominate over individual issues in this action.

2. Superiority

Finally, "[f]or Rule 23(b)(3) certification to be proper a class action also must be the most 'fair and efficient' method of resolving this case." In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 230 (2d Cir. 2006) (citing Fed. R. Civ. P. 23(b)(3)). "In analyzing that question, courts consider four nonexclusive factors: (1) the interest of the class members in

---

[5] For purposes of this part of this memorandum and order, this Court assumes that the Defendants could assert the LiPuma Release in this action.

maintaining separate actions; (2) 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class'; (3) 'the desirability or undesirability of concentrating the litigation of the claims in the particular forum'; and (4) 'the difficulties likely to be encountered in the management of a class action.'" Nassau Cty., 461 F.3d at 230 (citing Fed. R. Civ. P. 23(b)). However, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." Visa Check, 280 F.3d at 140 (quotation marks omitted).

A class action is the superior method of adjudicating these claims. Many of the class members' claims will be small relative to the high costs of maintaining an antitrust action. Also, this Court has significant experience regarding this action as a consequence of the MDL Proceeding. Streamlining the litigation in one forum will simplify the process and avoid inconsistency. Thus, conservation of judicial resources warrants litigating this case as a class action on the issues of liability and damages.

As for Defendants' concerns regarding manageability of the class, they do not pose a specter preventing certification. In the end, Defendants' manageability concerns turn on the precise amount of damages each class member suffered. Such concerns are premature. See Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 677 (7th Cir. 2009) ("What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable . . . [s]uch a possibility or indeed inevitability does not preclude class certification. . . ."). As the MDL Proceeding demonstrated, while classes of this size present challenges, they are manageable. Although the proposed class is large, it is defined. The members' names and addresses are known, they have certified that they paid foreign currency conversion fees, and many have submitted claims including the actual amounts of transactions.

Indeed, a number of the large claims have been audited by the claims administrator. While this action involves a narrower period than the underlying MDL Proceeding, many of the issues that Defendants raise can be resolved later, if liability is found. Therefore, this Court concludes that the class methodology is clearly superior because it is most likely to promote fairness and efficiency.

### D. Conclusion

Accordingly, this Court finds that Plaintiffs have demonstrated that they meet the requirements of Rule 23(a) and (b)(3), and certifies the following class:

> All Visa, MasterCard and Diners Club general purpose cardholders who used cards issued by any of the Co-Conspiring Banks during the Damages Period from July 22, 2000 to November 8, 2006, and were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services priced in foreign currencies or in foreign countries and who have submitted valid claims, regardless of timeliness in the settlement of In re Currency Conversion Fee Antitrust Litigation, No. 01-MD-1409 (WHP), Master File No. 21-95 (S.D.N.Y.).

Robert Ross and Randall Wachsmuth are appointed the class representatives.

### III. Appointment of Counsel

An order certifying a class must also appoint class counsel who will adequately represent the interests of the class. Fed. R. Civ. P. 23(c)(1)(B), 23(g)(1). The court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsel's experience in handling potential claims in the actions, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the present action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class. See Fed. R. Civ. P. 23(g)(1)(C). This Court is satisfied that Merrill G.

Davidoff, Esq. and his law firm Berger & Montague, P.C. meet these criteria and will adequately represent the interests of the class as lead counsel.

## IV. Amendment of Defendants' Answer

"Once the deadline for amendment in a scheduling order has passed, leave to amend may be denied 'where the moving party has failed to establish good cause.'" Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quoting Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000)). This is because Rule 16 "is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." Parker, 204 F.3d at 340 (citation omitted). "[A] finding of 'good cause' depends on the diligence of the moving party." Parker, 204 F.3d at 340. Therefore, the movant must "show that the deadlines [could not] be reasonably met despite its diligence." Lincoln v. Potter, 418 F. Supp. 2d 443, 454 (S.D.N.Y. 2006). Also, "[w]here the amended portion of the [pleading] would fail to state a cause of action . . . the district court may deny the party's request to amend." Parker, 204 F.3d at 339. An amendment to add an affirmative defense is futile when "the proposed affirmative defense is not a defense to liability," that is, "when the proposed affirmative defense lacks a sound basis in law. . . ." Greenes v. Vijax Fuel Corp., 326 F. Supp. 2d 464, 466, 468 (S.D.N.Y. 2004).

American Express's conduct in this action has not been a paradigm of diligence. American Express was well aware of the LiPuma Release from the moment this litigation began in July 2004. Yet it omitted any reference to the LiPuma Release or LiPuma Action when it answered the Complaint on September 20, 2004. At the December 8, 2004 initial pre-trial conference, the Court engaged the parties in a lengthy colloquy regarding the LiPuma Action. At that conference, American Express never suggested it would assert any defense related to the

LiPuma Release. This Court fixed February 1, 2005 as the deadline for amendment to the pleadings. However, this Court need not determine whether American Express has been diligent because American Express's amendment would be futile.

"It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002); see also Info. Superhighway, Inc. v. Talk Am., Inc., 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003).[6] When interpreting unambiguous contracts, the terms must be afforded their plain meaning. LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005); Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000). The interpretation of a contract is a legal matter for the court. See 805 Third Ave. Co. v. M.W. Realty Assocs., 448 N.E.2d 445, 447 (N.Y. 1983). "[U]nless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law." Dolman v. U.S. Trust Co. of N.Y, 138 N.E.2d 784, 787 (N.Y. 1956). Such a presumption applies to federal law as well. See Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 618 (2d Cir. 2001). On a motion to amend, a contract integral to the amendment may be considered by the judge, who "need not accept [the moving party's] description" of the contract "but may look to the agreement itself." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005) (concluding that the "contract language . . . unambiguously foreclose[d]" plaintiff's claims). This Court may also consider the orders and

---

[6] There is no dispute that the LiPuma Release is governed by New York law. See Amex I, 2005 WL 2364969, at *11 n.5.

30

docket of another court. See <u>Rivera-Powell v. N.Y. City Bd. of Elections</u>, 470 F.3d 458, 463 n.6 (2d Cir. 2006).

"[C]lass action releases may include claims not presented [in the complaint] and even those which could not have been presented so long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." <u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 396 F.3d 96, 107 (2d Cir. 2005) (quoting <u>TBK Partners, Ltd. v. W. Union Corp.</u>, 675 F.2d 456, 460 (2d Cir. 1982) ("[A] court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action.")); <u>see also</u> <u>In re Global Crossing Sec. & ERISA Litig.</u>, 225 F.R.D. 436, 458 (S.D.N.Y. 2004). Thus, "[a] class action settlement may 'prevent class members from subsequently asserting claims relying on a legal theory different from that relied on in the class action complaint, but depending on the very same set of facts.'" <u>In re Worldcom, Inc. Sec. Litig.</u>, No. 02 Civ. 3288 (DLC), 2005 WL 2495554, at *3 (S.D.N.Y. Oct. 11, 2005) (quoting <u>Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.</u>, 660 F.2d 9, 18 n.7 (2d Cir. 1981)). This rule of law serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that "prevent relitigation of settled questions at the core of a class action." <u>TBK Partners</u>, 675 F.2d at 460; <u>see also</u> 4 Alba Conte & Herbert Newberg, Newberg on Class Actions § 12:15, at 312 (4th ed. 2002) ("The scope of a judgment must be limited to the claims that were asserted or that may arise out of the transactions or events pleaded in the complaint . . .").

Plaintiffs seek compensation for a fee imposed on cards issued by the MDL Defendants and paid to the MDL Defendants. The claims and damages in this case are not premised on any fee imposed by American Express or collected by American Express, but rather, on American Express's alleged agreement and conspiracy with the MDL Defendants to raise

prices. See Ambrook Enters. v. Time, Inc., 612 F.2d 604, 620 (2d Cir. 1979) ("Plaintiff having dealt with these members of the alleged illegal conspiracy, all other members are jointly and severally liable for the damages [Plaintiff] sustained.").

Indeed, all Plaintiffs must prove is that American Express reached an agreement or conspired with the MDL Defendants to fix prices. The success or failure of American Express's foreign currency conversion fee practices is immaterial. See United States v. Trenton Potteries, Inc., 273 U.S. 392, 402 (1927) (noting it is "immaterial whether the agreements were ever actually carried out, whether the purpose of the conspiracy was accomplished in whole or in part, or whether an effort was made to carry out the object of the conspiracy into effect"); United States v. Foley, 598 F.2d 1323, 1333 (4th Cir. 1979) ("Since the agreement itself, not its performance, is the crime of conspiracy, the partial non-performance of [the defendant] does not preclude a finding that it joined the conspiracy." (citations omitted)); see also United States v. Giordano, 693 F.2d 245, 249 (2d Cir. 1982) ("Since the conspiratorial plan itself raises the danger, the illegality of the agreement does not depend on the achievement of its goal . . . [m]oreover, it does not matter that the ends of the conspiracy were from the beginning unattainable.").

To circumvent this obstacle, American Express now claims that any allusion to American Express's foreign currency conversion practices in the Complaint—even though these claims bear no transactional relationship to American Express's currency conversion charges—is sufficient to invoke the LiPuma Release. However, such a broad reading would violate the identical factual predicate doctrine by releasing claims that do not arise out of the same core nucleus of fact, see Nat'l Superspuds, 660 F.2d at 16-18; In re Auction House Antitrust Litig., No. 00 Civ. 648 (LAK), 2001 WL 170792, at *11-13 (S.D.N.Y. Feb. 22, 2001), aff'd, 42 Fed.

32

App'x 511 (2d Cir. 2002), and would be inconsistent with the LiPuma court's understanding on final approval, see LiPuma, 406 F. Supp. 2d at 1317-18. That approval was premised on the transactional relationship between the harms alleged in the LiPuma Amended Complaint and those that the objectors complained were within the scope of the release. Indeed, the LiPuma court noted that the transactional relationship was essential to the validity of the notice sent to class members.

American Express's elastic interpretation of the release would unmoor it from LiPuma Action and lead to bizarre results. For example, the LiPuma Release includes the claims of "respective heirs, executors, administrators, representatives, agents, attorneys, partners, spouses, successors, predecessors-in-interest, assigns, and any authorized users of their accounts." If the LiPuma Release is untethered from the transactional or "core nucleus of fact" understanding and stretched to encompass claims like those in this action, this provision becomes nonsensical—purporting to release claims of persons who were not even members of the LiPuma class and may have received no compensation. But if the release is understood as releasing only claims arising from the same core nucleus of fact, this language is logical: no other party, by assignment or operation of law, can assert claims arising from those same transactions.

Therefore, this Court finds that the LiPuma Release cannot include the claims asserted in this action and an affirmative defense based on the LiPuma Release would be futile. Accordingly, American Express's motion to amend its answer is denied.

## CONCLUSION

For the reasons set forth above, Plaintiffs' renewed motion for class certification

is granted. This Court certifies the following damages class:

> All Visa, MasterCard and Diners Club general purpose cardholders who
> used cards issued by any of the Co-Conspiring Banks during the
> Damages Period from July 22, 2000 to November 8, 2006, and were
> assessed a foreign transaction fee or surcharge for using such cards to
> purchase goods and/or services priced in foreign currencies or in foreign
> countries and who have submitted valid claims, regardless of timeliness
> in the settlement of In re Currency Conversion Fee Antitrust Litigation,
> No. 01-MD-1409 (WHP), Master File No. 21-95 (S.D.N.Y.).

This Court appoints Robert Ross and Randall Wachsmuth as class representatives. This Court

also appoints Merrill G. Davidoff, Esq. and Berger & Montague, P.C. as counsel to the class.

Finally, Defendants' motion to amend their answer to raise the defense of release is denied.

Dated: January 22, 2010
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

*Counsel for Plaintiffs:*

Merrill G. Davidoff, Esq.
Charles P. Goodwin, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

Gregory K. Arenson, Esq.
Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022

Ann D. White, Esq.
Mager White & Goldstein, LLP
The Pavilion
261 Old York Road, Suite 810
Jenkintown, PA 19406

Marc Edelson, Esq.
Hoffman & Edelson, L.L.C.
45 West Court Street
Doylestown, PA 18901

Christopher M. Burke, Esq.
Scott + Scott, LLP
600 B Street, Suite 1500
San Diego, CA 92101

R. Scott Palmer, Esq.
Berman, Devalerio, Pease, Tabacco, Burt & Pucillo
222 Lakeview Avenue
Suite 900
West Palm Beach, FL 33401

*Counsel for Defendants:*

Evan R. Chesler, Esq.
Elizabeth L. Grayer, Esq.
Cravath, Swaine & Moore LLP
One Worldwide Plaza
825 Eighth Avenue
New York, NY 10019